MUNICIPIO DE SAN JUAN, peticionario, *v.* BANCO GUBERNAMEN-
TAL DE FOMENTO, recurrido.

*Número:* AC-95-41 *Resuelto:* 21 de mayo de 1996

874

*Rafael Escalera Rodríguez*, de *Reichard & Escalera*, abogados del recurrente; *Arturo J. García Solá, Gilberto J. Marxuach Torrós, Raúl M. Arias Marxuach*, de *McConnell Valdés*, abogados del recurrido; *Rafael A. Díaz Díaz* y *Teresa Pacheco Camacho*, abogados de la Oficina de Asuntos Municipales, en calidad de *amicus curiae*.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Nos corresponde resolver si el Municipio de San Juan (en adelante el Municipio) tiene derecho a utilizar el dinero en exceso que había sido depositado en el Fondo de Redención de la Deuda Municipal (en adelante el Fondo de Redención) en el Banco Gubernamental de Fomento (en adelante el Banco) para pagar sus deudas operacionales contraídas. El dinero depositado en dicho fondo se recauda anualmente mediante una Contribución Adicional Especial (en adelante C.A.E.), que se impone sobre la propiedad en San Juan.

En el recurso ante nos, el Municipio apela la sentencia del Tribunal de Circuito de Apelaciones que concluyó que el Banco no tenía la obligación de devolver el exceso de dinero que hay en el Fondo de Redención para revocar así la sentencia del Tribunal de Primera Instancia. Dado que los recaudos depositados en el Fondo de Redención sobrepasan lo necesario para pagar el principal y los intereses de los empréstitos que habían vencido este año y de los que vencen durante los próximos doce (12) meses, el Municipio reclama que tiene derecho a utilizar dicho exceso acumulado

en su cuenta, para pagar sus deudas corrientes y así evitar tener que incurrir en préstamos para obtener el dinero que necesita. Por entender que el Banco tiene la obligación de remitir al Municipio el exceso solicitado, revocamos.

## I

La controversia del caso de autos surge a raíz de una solicitud que hiciera el Municipio al Banco mediante una carta cursada el 28 de septiembre de 1994 para que dicha institución le hiciera entrega de cualquier "exceso" depositado en su cuenta en el Fondo de Redención. El Municipio reclamaba que, una vez fueron substraídas las sumas comprometidas para asegurar el pago del principal y de los intereses de sus obligaciones generales que habrían de vencer durante los doce (12) meses siguientes, se le devolviera el sobrante millonario depositado en el Fondo de Redención. Fundamentó su solicitud en las disposiciones pertinentes de la Ley Municipal de Préstamos,[1] la Ley del Centro de Recaudación de Ingresos Municipales,[2] y la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico de 1991 (en adelante Ley de Municipios Autónomos)[3]. Con dichos fondos acumulados en exceso, que habían sido recaudados de sus ciudadanos mediante la C.A.E. sobre la propiedad, el Municipio se proponía pagar otras deudas u obligaciones operacionales previamente contraídas.

El Banco se negó a remitir el exceso fundamentándose en que, según su interpretación de la Ley Municipal de Préstamos, los municipios sólo pueden utilizar estos fondos de la C.A.E. como una garantía colateral adicional para

---

[1] Ley Núm. 7 de 28 de octubre de 1954, según enmendada, 21 L.P.R.A. sec. 921 *et seq.*

[2] Ley Núm. 80 de 30 de agosto de 1991 (21 L.P.R.A. sec. 5801 *et seq.*).

[3] Ley Núm. 81 de 30 de agosto de 1991 (21 L.P.R.A. sec. 4001 *et seq.*).

emitir nueva deuda pública[4] a largo plazo y de esta manera refinanciar las obligaciones preexistentes. Además, el Banco sostuvo que la única situación en que se produce el "exceso" es cuando, luego de separar el pago de la totalidad de la deuda pública del municipio, existe algún sobrante. A raíz de ese computo, San Juan no contaba en la actualidad con excesos disponibles en el Fondo de Redención.

El 3 de noviembre de 1994 el Municipio acudió al Tribunal de Primera Instancia, Sala Superior de San Juan, y solicitó la expedición de un auto de *mandamus* para que el Banco cumpliera con su deber ministerial de remitirle los "excesos correspondientes". El 14 de junio de 1995 el juez de instancia, Hon. Ángel Hermida, dictó sentencia en la que expidió el *mandamus* solicitado. Luego de varias enmiendas a la parte dispositiva de la sentencia, el foro de instancia ordenó al Banco la entrega inmediata de $20,785,327.82 al Municipio, más cualquier suma adicional que el Centro de Recaudación de Ingresos Municipales depositara en el Fondo de Redención después de haber sido liquidadas finalmente las cuentas del Municipio para el Año Fiscal 1994–1995.

Al determinar que existían los "excesos", el Tribunal de Primera Instancia se fundamentó en que la obligación del Municipio de pagar su deuda pública es a su vencimiento anual y nunca con relación a la totalidad de dicha deuda: "La deuda pública se emite en diferentes momentos y con diferentes vencimientos a tenor con las necesidades de cada municipio y las condiciones de los mercados financieros. Es obvio pues, que la obligación de pagar se da periódicamente, con relación a aquella fracción de la deuda total que vence cada año, y nunca con relación a la totalidad de la deuda."[5]

---

[4] Deuda pública, según utilizado en esta opinión, se refiere a las deudas en forma de bonos y pagarés en anticipación de bonos en que incurren tanto los gobiernos municipales como el gobierno central.

[5] Sentencia de Tribunal de Primera Instancia de 14 de junio de 1995, págs. 6–7.

Por ello, el Tribunal de Primera Instancia determinó que el exceso a que se refiere la Sec. 2 de la Ley Núm. 66 de 5 de julio de 1985 (21 L.P.R.A. sec. 922 n.) y el Art. 13 de la Ley Municipal de Préstamos, 21 L.P.R.A. sec. 932, es el sobrante de la totalidad del Fondo de Redención, una vez asegurada la porción equivalente a los doce (12) meses siguientes del principal y de los intereses de los empréstitos. Al reconocer el carácter periódico de la deuda pública municipal, el foro de instancia se expresó sobre la razonabilidad de la interpretación del Banco, de que sólo existen excesos luego de cubrir el pago del principal y de los intereses de la totalidad de la deuda vigente:

> Si interpretáramos que la sección 2 de la Ley 66 aplica a esa situación exclusivamente, entonces la misma resultaría totalmente estéril desde un punto de vista práctico. Y como señaló el Tribunal Supremo en Díaz Aponte v. Comunidad San José Inc., opinión de 23 de junio 1992, JTS 81 [sic], es norma "reiterada" en el derecho puertorriqueño que los tribunales no deben "atribuirle futilidad a los actos legislativos.[6]

Además, el Tribunal de Primera Instancia sostuvo que la enmienda introducida por la Ley Núm. 66, *supra*, buscaba proveer a los municipios un mecanismo para atender el problema de las deudas operacionales. Esta ley les permitió atender el pago de las obligaciones mediante dos (2) mecanismos complementarios: la Sec. 1, que permite la emisión de nueva deuda a largo plazo, y la Sec. 2, que permite el pago directo de la deuda existente para evitar de esta manera tener que incurrir en una deuda mayor. 21 L.P.R.A. sec. 922 n. Sostuvo el Tribunal de Primera Instancia que la única limitación impuesta por la citada Ley Núm. 66 es que los municipios no utilizan el exceso de la reserva dispuesto en el Art. 13 de la Ley Municipal de Préstamos, *supra*, para contraer nuevas deudas sino para el pago de las deudas previamente contraídas.

---

[6] Íd., pág. 16.

Aunque reconoció que el uso del vocablo *refinancia-miento* en la Sec. 2 de la Ley Núm. 66, *supra*, "no fue una selección muy feliz", el foro de instancia rechazó el argumento del Banco a los efectos de que esos fondos sólo se podían utilizar para garantizar la emisión de una nueva deuda a largo plazo para pagar las ya contraídas. Dicha interpretación, según el texto y el historial del estatuto, carecería totalmente de lógica interpretativa, afirmó el Tribunal de Primera Instancia.

Inconforme, el Banco acudió en recurso de *certiorari* ante el Tribunal de Circuito de Apelaciones. El 7 de noviembre de 1995 dicho foro dictó la sentencia que revocó la determinación del Tribunal de Primera Instancia. En su decisión concluyó que el Municipio no tiene derecho a recibir, ni el Banco obligación de remitir, el exceso depositado en el Fondo de Redención. Sostuvo que su derecho estaba limitado a que, una vez se determine el exceso en dicho fondo, si alguno, se coloque éste a su disposición para que lo utilice como garantía para *refinanciar* aquellas deudas operacionales en las que haya incurrido previamente.[7]

El Tribunal de Circuito de Apelaciones interpretó que el Art. 13 de la Ley Municipal de Préstamos, *supra*, no autoriza la remisión a los municipios del producto de la C.A.E. Concluyó que el único uso que esta ley permite hacer de las contribuciones adicionales especiales (C.A.E.) que nutren el Fondo de Redención es pagar el principal y los intereses de la deuda pública; independientemente de que las cantidades recaudadas excedan las necesarias para dichos pagos según venzan. Finalmente, en lo referente al lenguaje de la Sec. 2 de la Ley Núm. 66, *supra*, expresó el Tribunal de Circuito de Apelaciones que, al emplear el vocablo *refinanciar*, la Asamblea Legislativa perseguía que los municipios pudieran obtener préstamos a largo plazo con los

---

[7] Sentencia del Tribunal de Circuito de Apelaciones, Circuito Regional de San Juan, 7 de noviembre de 1995, págs. 17–18.

exceso como garantía colateral y así satisfacer obligaciones previas y acumuladas.

El Municipio presentó ante nos un recurso de apelación a tenor con el Art. 3.002(f) de la Ley de la Judicatura de Puerto Rico de 1994 (4 L.P.R.A. sec. 22i),[8] en el cual se plantea la comisión de varios errores por parte del Tribunal de Circuito de Apelaciones. En síntesis, los errores señalados se circunscriben a la solución de las controversias siguientes: (a) si el esquema legal debe ser interpretado de modo que los municipios tengan derecho a utilizar los "excesos" del "Fondo de Redención" para el pago de deudas operacionales ya contraídas, y (b) si dicho "exceso" debe calcularse a base de la deuda vencida y la reserva de los doce (12) meses posteriores que ordena el Art. 13 de la Ley Municipal de Préstamos, *supra*.

Presentados los escritos de las partes, acogida la solicitud de intervención como *amicus curiae* de la Oficina del Comisionado de Asuntos Municipales y en consideración a la trascendencia y el interés público del caso, el 19 de marzo de 1996 este Foro celebró una vista oral. Luego de haber examinado los alegatos, la extensa documentación suplementaria sometida, y con el beneficio de la comparecencia de todas las partes en la audiencia, estamos en posición de resolver.

## II

*Reglas de hermenéutica legal*

■ La controversia del caso de autos esencialmente requiere que interpretemos la Ley Municipal de Préstamos de 1972, según enmendada por la Ley Núm. 66, *supra*, y a tenor con el esquema estatutario que forman las leyes de la reforma municipal de 1991. Al cumplir con nuestra función adjudicativa partimos de la premisa de que cuando el len-

_____

[8] Ley Núm. 1 de 28 de julio de 1994 (4 L.P.R.A. sec. 22 *et seq.*).

guaje de una ley es claro, no debemos menospreciar su letra bajo el pretexto de cumplir con su espíritu. Sin embargo, cuando el lenguaje de un estatuto no muestra con claridad la intención legislativa, no podemos limitarnos a la interpretación gramatical para precisar cuál ha sido la voluntad legislativa. En efecto, "la literalidad puede ser ignorada cuando es claramente contraria a la verdadera intención o propósito legislativo". *Clínica Juliá v. Sec. de Hacienda*, 76 D.P.R. 509, 520 (1954).

En ocasiones, es necesario rechazar la interpretación literal del texto cuando ésta conduce a un resultado distinto al que el Legislador intentó. *Pueblo v. Seda*, 82 D.P.R. 719, 725 (1961). De igual forma, al precisar la voluntad del Legislador, debemos presumir la sensatez y razonabilidad de dichos actos legislativos. Una interpretación de ley que conduzca a una conclusión absurda, debe ser rechazada. E. Bernier y J.A. Cuevas Segarra, *Aprobación e interpretación de las leyes en Puerto Rico*, 2da ed. rev., San Juan, Pubs. J.T.S., 1987, Vol. 1, pág. 242. Por ello, al ejercer nuestra función de interpretar las leyes, "tenemos la obligación de armonizar hasta donde sea posible todas las disposiciones de ley envueltas para lograr el resultado *más sensato, lógico y razonable*". (Escolio omitido y énfasis suplido.) *Andino v. Fajardo Sugar Co.*, 82 D.P.R. 85, 94 (1961).

Hemos expresado, además, que "[l]a ley nunca debe interpretarse tomando una frase aislada, sino tomando en consideración integralmente todo su contexto". *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 90 (1983). " '[A]l interpretar la ley hay que leerla y considerarla en su totalidad, no fraccionalmente y para encontrarle su significado, el tribunal tiene que tener en cuenta el propósito de la misma.' " *Delgado v. D.S.C.A.*, 114 D.P.R. 177, 182 (1983), citando a *Cirino v. Fuentes Fluviales*, 91 D.P.R. 608, 616 (1964).

A tenor con estos principios de interpretación, debemos examinar a grandes rasgos el ordenamiento municipal en Puerto Rico para luego analizar en detalle las disposiciones de la Ley Municipal de Préstamos aplicables a la controversia de autos.

## III

*El ordenamiento legal de los municipios en Puerto Rico*

En 1991 la Asamblea Legislativa aprobó varias leyes para reformar integralmente la constitución, la organización, la administración y el funcionamiento del régimen del gobierno municipal en Puerto Rico. Las leyes que integran la reforma municipal de agosto de 1991 son las siguientes: (1) la Ley de Municipios Autónomos; (2) la Ley del Centro de Recaudación de Ingresos Municipales; (3) la Ley de Contribución Municipal sobre la Propiedad de 1991 (21 L.P.R.A. sec. 5001 *et seq.*), y (4) la Ley de Patentes Municipales, 21 L.P.R.A. sec. 651 *et seq.*[9] "Esta reforma abarcadora del ordenamiento municipal otorgó a los municipios un mayor grado de autonomía fiscal y de gobierno propio, además de nuevos instrumentos administrativos y fiscales." *Alcalde Mun. de Humacao v. Ramos Cofresí*, 140 D.P.R. 587, 595 (1996). Su objetivo principal fue "iniciar un proceso de renovación político-administrativo del gobierno municipal con la finalidad de fomentar una mayor autonomía y la descentralización gubernamental de Puerto Rico". L. Santana Rabell y M. Negrón Portillo, *La reforma municipal en Puerto Rico: retos y oportunidades*, Río Piedras, Escuela Graduada de Administración Pública, 1993, pág. 14. Veamos las leyes más importantes.

### A. *Ley de Municipios Autónomos*

La ley rectora de esta reforma fue la Ley de Muni-

---

[9] Todas estas leyes se aprobaron el 30 de agosto de 1991.

cipios Autónomos, que sustituye y deroga la Ley Orgánica de los Municipios de Puerto Rico. La nueva legislación expresamente rechaza el esquema de centralización que predominaba anteriormente en Puerto Rico. Se declara política pública del Estado Libre Asociado *"otorgar a los municipios el máximo posible de autonomía y proveerles las herramientas financieras y los poderes y facultades necesarias para asumir un rol central y fundamental en su desarrollo urbano, social y económico"*. (Énfasis suplido.) Declaración de política pública, Art. 1.002 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4001 n.

■ A tenor con su espíritu, la Ley de Municipios Autónomos expresamente dispone que *los poderes y las facultades conferidos a los municipios "por este subtítulo o cualquier otra ley, excepto disposición en contrario, se interpretarán liberalmente, de forma tal que se propicie el desarrollo e implantación de la política pública enunciada en este subtítulo de garantizar a los municipios facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y bienestar de los habitantes del mismo"*. (Énfasis suplido.) 21 L.P.R.A. sec. 4002. Es dentro de este marco estatutario de mayor autonomía administrativa y fiscal de los municipios, y a tenor con la norma hermenéutica de interpretación liberal adoptada en la Ley de Municipios Autónomos, que debemos interpretar las disposiciones aplicables a las controversias de autos.

B. *Ley del Centro de Recaudaciones de Ingresos Municipales (Ley del C.R.I.M.)*

■ Como parte de esta reforma, y para viabilizar la autonomía de los municipios, se creó el Centro de Recaudación de Ingresos Municipales (en adelante C.R.I.M.) con la función de tasar, cobrar y distribuir el producto de las contribuciones sobre la propiedad y de cualesquiera otros ingresos recaudados que se disponga por ley para los municipios. 21 L.P.R.A. secs. 5802 y 5803(b). Para otor-

garle a los municipios más control sobre la recaudación de las contribuciones sobre la propiedad y para evitar que el gobierno central controlara indebidamente el proceso fiscal de los municipios, el C.R.I.M. fue creado como una entidad independiente y separada de cualquier otra agencia o instrumentalidad del Estado. De la Exposición de Motivos claramente se desprende que esta ley respondió a la preocupación de los municipios de que el Gobierno central ejercía un control indebido sobre los fondos municipales y que no estaba recaudando diligentemente las contribuciones sobre la propiedad. Igualmente, atendió el reclamo de los gobiernos municipales de que los recaudos no se estaban distribuyendo adecuadamente y que se les mantenía ajenos al manejo de sus principales fuentes de ingreso; a saber, las contribuciones. Véase la Exposición de Motivos de la Ley Núm. 80 de 30 de agosto de 1991, Leyes de Puerto Rico 437.

A tenor con estos propósitos, se creó una junta de gobierno independiente, compuesta en su mayoría por alcaldes, asegurando así que éstos tuvieran control tanto sobre los recaudos, como sobre la distribución de los ingresos obtenidos mediante las contribuciones municipales. Para asegurar que los recaudos de las contribuciones fueran distribuidos adecuadamente a los municipios, se le transfirieron al C.R.I.M. las funciones que tenía el Secretario de Hacienda con relación a la tasación, la determinación y el cobro de las contribuciones municipales sobre la propiedad. 21 L.P.R.A. sec. 5803. Finalmente, por virtud de esta legislación, el C.R.I.M. estableció un fideicomiso con el Banco para recibir todos los ingresos recaudados de las contribuciones sobre la propiedad. 21 L.P.R.A. secs. 5803(c) y 5004.

## C. *Ley de Contribución Municipal sobre la Propiedad*

La tercera ley de importancia que fue aprobada como parte de la reforma es la Ley de Contribución Municipal sobre la Propiedad. Esta ley dispone la imposición de

tres (3) tipos de contribuciones sobre la propiedad mueble e inmueble que se recaudan anualmente: (1) la "contribución básica (C.B.)"; (2) la contribución especial (en adelante la C.E.), y (3) la "contribución adicional especial" (C.A.E.). Cada una de estas contribuciones se destina por ley para fines distintos.

La *contribución básica* (C.B.) es utilizada primordialmente para cubrir los gastos operacionales de los municipios. La *contribución especial* (C.E.) es un impuesto fijo de 1.03% anual sobre el valor tasado de la propiedad mueble e inmueble, cuyo producto se destina a la amortización y el pago de obligaciones generales del Estado Libre Asociado. 21 L.P.R.A sec. 5002. La C.E., por lo tanto, no se utiliza para gastos del municipio, sino que se utiliza para el pago de la deuda pública del gobierno central.

El tercer tipo de contribución que imponen los municipios es la C.A.E. 21 L.P.R.A. sec. 5002. Los municipios tienen la facultad para imponer contribuciones adicionales especiales (C.A.E.) sobre la propiedad para el pago de empréstitos. 21 L.P.R.A. sec. 4052(b). Dado que la C.A.E. se impone con el propósito primordial de garantizar el pago puntual de la deuda pública municipal, ella está sujeta a las disposiciones y los requisitos establecidos en la Ley Municipal de Préstamos. Véase 21 L.P.R.A. sec. 4401. Los ingresos de la C.A.E. se depositan en el "Fondo de Redención de la Deuda Municipal" en el Banco. 21 L.P.R.A. sec. 4052(b).

### D. *Ley Municipal de Préstamos*

 Al adoptarse las leyes de la reforma de 1991, el Legislador entendió que el esquema de financiamiento, contenido en la Ley Municipal de Préstamos vigente, era compatible con la aspiración de mayor autonomía local que inspiró dicha reforma. De tal modo, por ser innecesario reformar el esquema legislativo en esta área, la Ley de Municipios Autónomos provee que la emisión y el pago de la

deuda pública municipal se regirá por las disposiciones de la Ley Municipal de Préstamos. Véase 21 L.P.R.A. sec. 4401. Esta ley otorga la facultad a los municipios para emitir una deuda pública en forma de bonos y de pagarés en anticipación de bonos como un medio de gran importancia para llevar a cabo su obra pública. 21 L.P.R.A. secs. 924 y 928. Ésta rige detalladamente todo lo relativo a la emisión, el monto y el pago del principal y los intereses de la deuda que periódicamente emiten los municipios.

▐ En particular, el Art. 13 de la Ley Municipal de Préstamos, *supra*, rige lo relacionado a las garantías de pago de los bonos que emiten los municipios. Este artículo es de central importancia para la solución de la controversia de autos en cuanto dispone sobre el uso que debe dársele a la C.A.E., una vez garantizado el pago de la deuda pública. En síntesis, mientras el Municipio sostiene que dicho artículo impone la obligación al Banco de remitirle los excesos de la C.A.E. acumulados en el Fondo de Redención, el Banco alega que tal obligación no está dispuesta en el estatuto. Veamos.

## IV

*La Ley Municipal de Préstamos: disposiciones sobre la imposición y utilización de la C.A.E.*

### A. *El Artículo 13 de la Ley Municipal de Préstamos*

▐ Con el fin de garantizar el pago de la deuda pública emitida por los municipios, el citado Art. 13 dispone que la Asamblea Municipal, al autorizar la emisión de bonos, *tiene el deber de imponer una C.A.E. anual sin límite,*[10] *que sea suficiente para pagar el principal y los intereses sobre todos los bonos emitidos según venzan.* 21

---

[10] Esta facultad de imponer contribuciones adicionales ilimitadas para responder por el pago de los bonos tuvo el propósito de proveer la seguridad necesaria a los bonos municipales para competir adecuadamente en el mercado de bonos de Estados Unidos.

L.P.R.A. sec. 932.([11]) Dado que la C.A.E. que se recauda anualmente puede ser menor que lo necesario para cubrir el servicio de la deuda que habrá de vencer, el Art. 13, *supra*, establece un *primer gravamen* sobre el producto de *todas* las contribuciones sobre la propiedad que impone el Municipio.([12]) El gravamen se impone expresamente tanto sobre la C.A.E. como sobre las demás contribuciones. Este gravamen impuesto sobre todas las contribuciones se hace efectivo mediante una reserva para el pago de los empréstitos que van a vencer durante los doce (12) meses posteriores a la remisión. En caso de que la C.A.E. no sea suficiente para cubrir la deuda vencida y la reserva de doce (12) meses, la ley requiere que se deposite en el Fondo de Redención el dinero proveniente de las restantes contribuciones —básica o especial— hasta cubrir la reserva aludida.

▆▆ De esta manera la legislación actual tiene un me-

---

([11]) El Art. 13 de la Ley Municipal de Préstamos dispone:

"La buena fe, el crédito y la facultad del municipio para imponer contribuciones ilimitadas, quedan por la presente empeñados para el pago puntual del principal de y de los intereses sobre todos los bonos y pagarés en anticipación de bonos emitidos bajo las disposiciones de este Capítulo. La junta de gobierno deberá en la ordenanza autorizando bonos, proveer para la imposición anual de una contribución sobre el valor de la propiedad sin limitación en cuanto a tipo o cantidad sobre toda la propiedad sujeta a contribución en el municipio, suficiente para pagar el principal de y los intereses sobre todos los bonos emitidos bajo este Capítulo, según venzan tales principal e intereses, excluyendo, sin embargo, cualquier interés que se provea pagarse del producto de los bonos. Tales contribuciones y cualesquiera otras contribuciones sobre el valor de la propiedad serán cobradas por el Secretario de Hacienda de Puerto Rico y el principal de y los intereses sobre todos los bonos que se emitan bajo este Capítulo constituirán un primer gravamen sobre el producto de tales contribuciones y todas otras contribuciones sobre el valor de la propiedad. Al recibo del producto de tales contribuciones el Secretario de Hacienda deberá, antes de remitir cualquier producto de tales contribuciones al municipio, separar una cantidad suficiente para que conjuntamente con otros fondos entonces en depósito y disponibles para tales propósitos sean suficientes para pagar el capital y los intereses a vencer durante los siguientes doce (12) meses sobre bonos del municipio. Dicho principal e intereses serán pagados por el Secretario de Hacienda de Puerto Rico (a través del agente o agentes pagadores designados en tales bonos) a nombre del municipio del producto de tales contribuciones y de cualquiera otros fondos disponibles para tal propósito." 21 L.P.R.A. sec. 932.

([12]) El Legislador reconoce que cabe la probabilidad de que los recaudos, en un año particular, sean menores que la cantidad impuesta de la Contribución Adicional Especial (en adelante la C.A.E.). Esta inusual situación puede ocurrir, por ejemplo, en años en que se registre un número considerable de evasores contributivos.

canismo diseñado específicamente para garantizarle a los bonistas que en los casos cuando los recaudos en concepto de la C.A.E. no sean suficientes para pagar el servicio de la deuda, el Banco puede utilizar fondos provenientes de las otras contribuciones para cumplir con las obligaciones impuestas por los bonos emitidos. Esto evita que se desarrolle una crisis en el financiamiento público en el ámbito municipal y asegura la confianza necesaria en los mercados de valores de los bonos municipales. Además, tiene el efecto de mantener la confianza en las finanzas públicas del país.

A tenor con estos propósitos, el Art. 13 de la Ley Municipal de Préstamos, *supra*, le ordena al C.R.I.M.([13]) que *"antes de remitir"* el producto de *tales contribuciones* al municipio, debe *"separar una cantidad suficiente que conjuntamente con otros fondos entonces en depósito y disponibles para tales propósitos sean suficientes para pagar el capital y los intereses a vencer durante los siguientes doce (12) meses sobre bonos del municipio"*. (Énfasis suplido.) Esta última disposición establece el mencionado mecanismo para hacer efectivo el "primer gravamen".

Del lenguaje del citado Art. 13 claramente se desprende que el Legislador reconoció que el producto de la C.A.E. en cierto momento podía exceder la cantidad necesaria para responder por la deuda pública vencida. En tal situación, el Municipio tiene el derecho de disponer de tales excesos. Por ello, y para garantizar la reserva de un año, el Legislador dispuso, en lo pertinente, lo siguiente:

> *Al recibo del producto de tales contribuciones* el Secretario de Hacienda deberá, *antes de remitir cualquier producto de tales contribuciones al municipio*, separar una cantidad suficiente. (Énfasis suplido.) 21 L.P.R.A. sec. 932.

---

([13]) En la Ley Municipal de Préstamos, esta función la ejercía el Secretario de Hacienda. La Ley del Centro de Recaudación de Ingresos Municipales le adjudicó dicha función al Centro de Recaudación de Ingresos Municipales (en adelante el C.R.I.M.).

· Del texto citado surge meridianamente claro que *antes de remitir*, ya sea el producto de la C.A.E. o el de otras contribuciones, el C.R.I.M. tiene la obligación de separar la reserva de doce (12) meses que impone el gravamen. El Legislador contempla con claridad que la norma es la de remitir a los municipios el exceso del producto de la C.A.E., la reserva es la limitación que impone la ley. Como correctamente afirma el Tribunal de Primera Instancia, de este texto resulta claro "que el esquema contemplado por dicho estatuto provee para que el Gobierno central remita a los municipios el producto de las contribuciones impuestas por cada municipio luego de separar las cantidades adecuadas para hacer valer el gravamen preferente". Sentencia del Tribunal de Primera Instancia de 14 de junio de 1985, pág. 8. De lo contrario el lenguaje del estatuto no dispondría que había que separar los fondos de todas las contribuciones, incluyendo la C.A.E., "antes de remitir" el resto a los municipios. Además, y contrario a lo que concluyó el Tribunal de Circuito de Apelaciones, del texto del citado Art. 13 surge que el Legislador no excluyó ni expresa ni implícitamente a la C.A.E. de los fondos que el C.R.I.M. tenía que remitir a los municipios, una vez cubierta la reserva de los doce (12) meses en el Fondo de Redención.

Además, un análisis del Art. 13, *supra*, antes de su enmienda en 1972 revela que anteriormente el Secretario de Hacienda (hoy sería el C.R.I.M.) sólo tenía autoridad para retener fondos de la C.A.E. para pagar la deuda pública según esta vencía y nada más. En 1972 se incorporó el mecanismo del *primer gravamen* sobre todas las contribuciones, mediante el cual se autoriza la retención de los recaudos de tales contribuciones para el servicio de la deuda por los próximos doce (12) meses. Hasta ese momento, el Secretario de Hacienda tenía que remitir a los municipios cualquier exceso que se recaudara de la C.A.E. para su utilización sin retenciones adicionales. El primer gravamen que se impone sobre la C.A.E. y sobre las demás con-

tribuciones es lo que autoriza la retención de la C.A.E. para la reserva adicional de doce (12) meses. Otra interpretación de esta enmienda supondría que la Asamblea Legislativa actuó en forma fútil.

El esquema vigente hoy según el Art. 13, *supra*, en cuanto a la autoridad del C.R.I.M. o del Banco de retener los excesos es el mismo que existía cuando la función de recaudación la realizaba el Secretario de Hacienda. Examinado tanto el texto del Art. 13 de la Ley Municipal de Préstamos, *supra*, como su desarrollo a través de los últimos años, concluimos que ni al C.R.I.M. ni al Banco como fiduciario legal les asiste autoridad alguna para retener el "exceso" de la C.A.E. que el Municipio impone sobre sus ciudadanos y que le pertenece por ley a dicho municipio. Por lo tanto, el Banco como depositario de esos fondos tiene el deber de remitir dichos excesos a los municipios, una vez ha establecido la reserva de los doce (12) meses requerida por ley. El único cambio que ha sufrido el esquema del Art. 13, descrito anteriormente, está contenido en la Ley Núm. 66, *supra*, la cual enmienda la Ley Municipal de Préstamos y que explicamos a continuación. Como hemos anticipado, las partes argumentan posiciones contrarias en cuanto al alcance de la referida enmienda de 1985.

B. *La enmienda de 1985 a la Ley Municipal de Préstamos*

Por razones ajenas a una correcta interpretación del Art. 13 de la Ley Municipal de Préstamos, *supra*, en la práctica, el sobrante de la C.A.E. no se devolvió a los municipios. Por ello se fueron acumulando anualmente excesos en el Fondo de Redención, los que a mediados de la década de 1980 sumaban cantidades millonarias. Es dentro de esta realidad que en medio de la crisis fiscal de los años 80 se aprobó la Ley Núm. 66, *supra*, para enmendar la Ley Municipal de Préstamos (en adelante enmienda de 1985).

Esta enmienda de 1985 sólo consta de dos (2) secciones. La primera sección elimina la disposición de la Ley Municipal de Préstamos que prohibía la emisión de bonos para el pago de deudas operacionales.([14]) Además, establece un mecanismo de sustitución de deudas operacionales en las que se ha incurrido por nuevas deudas, mediante la emisión de bonos.([15]) Previo a dicha enmienda, los municipios sólo podían utilizar sus recursos corrientes para pagar la totalidad de las deudas operacionales contraídas, limitando así su capacidad financiera para la prestación de servicios a la comunidad. Con esta enmienda la Legislatura atendió el problema de la falta de fondos para la prestación adecuada de servicios a la ciudadanía, al permitirle emitir una deuda para estos propósitos.

La enmienda de 1985 consta de una segunda sección, la cual dispone lo siguiente:

> Todo municipio que tenga *excesos* en el Fondo de Redención de la Deuda podrá utilizar dichos excesos para el *refinanciamiento* de otras deudas u obligaciones contraídas. (Énfasis suplido.) 21 L.P.R.A. sec. 922 n.

Las restantes controversias en el caso de autos entre el Municipio y el Banco radican precisamente en sus diferentes interpretaciones sobre el alcance de texto de la Sec. 2 de la enmienda de 1985, en particular el sentido de los términos *excesos* y *refinanciamiento*. El Municipio señala que *excesos*, según utilizado en la Sec. 2 de la Ley Núm. 66 *supra*, son los fondos de la C.A.E. que se encuentren en el

---

([14]) La Ley Municipal de Préstamos de 1954, en su Art. 3(a), prohibía expresamente la emisión de bonos municipales para gastos corrientes. 1954 Leyes de Puerto Rico 259. Esta prohibición fue expresamente eliminada por la Sec. 1 de la Ley Núm. 66 de 5 de julio de 1985 (21 L.P.R.A. sec. 922).

([15]) El Segundo Informe Conjunto de la Cámara de Representantes sobre el P. de la C. 544 de 30 de mayo de 1985, 10ma Asamblea Legislativa, 2da Sesión Ordinaria, pág. 2, arroja luz sobre el alcance de la sección primera de la Ley Núm. 66 cuando expresa que:

"La medida claramente contempla autorizar a los municipios a emitir obligaciones a largo plazo para el pago de la deuda corriente y así liberar los recursos corrientes para ofrecer servicios a la ciudadanía."

Fondo de Redención, luego de descontar lo que se necesite para cubrir el servicio de la deuda vencida y la que vence dentro del próximo año. Por su parte, el Banco sostiene que *excesos* se refiere al dinero sobrante después de separar suficientes fondos para pagar *la totalidad* de la deuda pública municipal, independientemente de su término de vencimiento.

El Municipio también afirma que la Ley Municipal de Préstamos le autoriza a utilizar los *excesos* que se han acumulado en el Fondo de Redención para pagar deudas u obligaciones en las que se haya incurrido. El Banco, por otro lado sostiene que el ordenamiento legal vigente no dispone la devolución de los referidos *excesos* al Municipio. Afirma que esta porción de la C.A.E. debe mantenerse *permanentemente* en el Fondo de Redención y sólo podrá ser utilizada por el Municipio como una garantía colateral adicional para nuevos préstamos.

Aunque reconocemos que el escueto texto de la Sec. 2 de la enmienda de 1985 no es un modelo de claridad, es nuestro deber interpretar su lenguaje a tenor con la intención legislativa y en armonía con el esquema vigente del Art. 13 de la Ley Municipal de Préstamos, *supra*. En particular nos corresponde interpretar el sentido normativo de los términos utilizados de tal forma que el Municipio pueda cumplir eficazmente con su deber de atender las necesidades y procurar el bienestar de sus habitantes.

*1. El significado del término "excesos" según utilizado en la Sec. 2 de la Ley Núm. 66*

Para resolver si existen *excesos* en la cuenta del Municipio del Fondo de Redención es preciso determinar a qué excesos se refería el Legislador al aprobar la enmienda de 1985. El Banco ha sostenido, y así lo acogió el Tribunal de Circuito de Apelaciones, que sólo existe un exceso en el Fondo de Redención de la Deuda Pública cuando los municipios han pagado la totalidad de su deuda vigente, incluso la que todavía no ha vencido.

Al interpretar el vocablo en controversia, somos conscientes de que en nuestro sistema económico los municipios recurren al financiamiento público para sus obras capitales y que por la magnitud de éstas, de ordinario se requiere la emisión de bonos y otras obligaciones con distintas fechas de vencimiento. Por la naturaleza de la obra gubernamental, los municipios continuamente recurren al mercado de valores para vender sus bonos y esta deuda nunca se paga en su totalidad en un año determinado. Dicho financiamiento público es, por lo tanto, un proceso continuo, que no cesa.

Por esta razón, la Ley Municipal de Préstamos parte de la premisa de que la deuda pública que emiten los municipios es de carácter periódico. Es decir, a través del estatuto se reconoce que ésta no vence en un sólo momento, sino en distintas fechas. Por lo tanto, la Ley Municipal de Préstamos sólo obliga a los municipios a pagar anualmente la porción de la deuda que esté vencida, y nunca requiere que se pague la totalidad de sus obligaciones en un año en particular. Es decir, el propio estatuto implícitamente reconoce que en términos prácticos es muy poco probable que en un año determinado un municipio opere libre de toda deuda u obligación. Tomamos conocimiento judicial de que nunca, ni el E.L.A. ni municipio alguno en Puerto Rico ha pagado la totalidad de su deuda pública en un solo año.

Tomando lo anterior en consideración, la interpretación del Banco de lo que son *excesos*, para todos los efectos prácticos, convierte a la Sec. 2 de la Ley Núm. 66, *supra*, en una disposición inoperante. El Gobierno, ya sea central o municipal, siempre tiene la necesidad de obtener fondos para realizar obras públicas y proveer los servicios, y el mecanismo básico que la ley provee para financiar estas obras y estos servicios es la emisión de deuda pública.

¿Cómo es posible entonces bajo la interpretación del Banco, que surja un exceso, si siempre habrá una deuda

vigente? Ante esta interrogante es forzoso concluir que el Banco define *excesos* abstrayéndose de la realidad descrita al sostener que éstos sólo existen luego de que el dinero depositado en el Fondo de Redención sea suficiente para cubrir la totalidad de la deuda. No podemos avalar esta interpretación.

En estas circunstancias, resolvemos que al utilizar el término *excesos* el Legislador se refería en específico a los excesos que el Art. 13 de la Ley Municipal de Préstamos, *supra*, exige que el gobierno central devuelva. Ausente una intención expresa o implícita de eliminar la remisión de la C.A.E. presentada en el Art. 13, debe entenderse que los *excesos* son recaudos de la C.A.E. que se acumulan en el Fondo de Redención, luego de sustraer lo suficiente para cubrir el servicio de la deuda pública municipal vencida ese año y la que vencerá dentro de los doce (12) meses siguientes a la remisión.

*Por supuesto, al computar el exceso de la cuenta correspondiente del Municipio, debe tomarse en cuenta la porción de la deuda que vencerá dentro de los próximos doce (12) meses de los préstamos que están pendientes de aprobación por el Banco.* Si finalmente dichos préstamos no se aprueban o se conceden por una cantidad que requiere un pago anual menor en los próximos doce (12) meses, el sobrante deberá ser remitido al Municipio.

2. *Significado del vocablo "refinamiento" según utilizado en la Sec. 2 de la Ley Núm. 66*

El uso del vocablo *refinanciar* en el contexto de la Ley Núm. 66, *supra*, no es el más preciso. Un análisis integral de esta disposición y de otras secciones de la ley revela que el término no tiene una acepción única, inequívoca y de aceptación general en nuestro ordenamiento. Por ello, lo determinante en cualquier interpretación de esta legislación es el significado normativo que represente de forma adecuada la verdadera intención del Legislador y que sea

compatible con el ordenamiento municipal descrito anteriormente.

Un análisis de toda la legislación municipal revela que el Legislador ha utilizado el término *refinanciamiento* con dos (2) acepciones distintas. Esto se evidencia, por ejemplo, en la Ley de Municipios Autónomos, en la cual empleó el término *refinanciar*: (1) para referirse a la sustitución de obligaciones vigentes por una deuda nueva, y (2) lo ha utilizado también en el sentido del pago de deudas con ingresos ordinarios y corrientes.

A modo de ejemplo, en el Art. 9.002(c) de la citada ley, según enmendado por la Ley Núm. 57 de 11 de agosto de 1994 (21 L.P.R.A. sec. 4402(c)), se utiliza el término *refinanciamiento* para referirse a la sustitución de una deuda operacional por nuevas emisiones de bonos o pagarés que los municipios están autorizados a llevar a cabo. Esta sección dispone que:

> Cuando lo estime necesario, el Banco Gubernamental de Fomento podrá evaluar la deuda municipal pagadera con ingresos operacionales y recomendar a los municipios el refinanciamiento de dicha deuda mediante la emisión de bonos y pagarés sobre la contribución básica. 21 L.P.R.A. sec. 4402.

En esta disposición, claramente se trata de un mecanismo de sustitución de deudas. No obstante, en ese mismo Art. 9.002(c), *supra*, más adelante, se autoriza otro tipo de *refinanciamiento* al disponer que:

> El Banco también podrá, cuando lo estime conveniente o necesario, considerar y recomendar el refinanciamiento de la deuda operacional a tenor con las disposiciones de la sec. 4311(b)....

La sec. 4311(b) (Art. 7.011(b)) en el texto citado *no autoriza emisión alguna de deuda, ni dispone sobre la sustitución de deudas vigentes por deudas nuevas.* En este Art. 7.011b —21 L.P.R.A. sec. 4311(b)— sólo se autoriza a los municipios a pagar deudas que constituyen un déficit presupuestario, con sus ingresos ordinarios, y dispone que

dicho pago se hará mediante una *amortización* de la deuda en un período de treinta (30) años.([16]) *Amortización* es la "[e]xtinción gradual de una deuda mediante pagos efectuados en fechas fijas o periódicas". I. Rivera García, *Diccionario de Términos Jurídicos*, 2da ed., New Hampshire, Ed. Equity, 1985, pág. 13. A este mecanismo el Legislador también le llama *refinanciamiento* y claramente no se trata de la sustitución de una deuda existente por una deuda nueva.([17])

En vista de lo anterior, aunque pueda argumentarse que en su acepción más generalizada el término *refinanciar* se refiere a la sustitución de una deuda contraída por una nueva deuda, no podemos concluir sin más que ese fue el sentido que quiso darle el Legislador. Una interpretación restrictiva y literal de dicho término, dentro de la normativa amplia, compleja y en ocasiones ambigua que gobierna la emisión y el pago de la deuda pública municipal, puede llevarnos a un resultado contrario a la verdadera intención del Legislador al aprobar la enmienda de 1985. A tenor de los principios de hermenéutica ya expuestos, dicho término debe interpretarse: (1) presumiendo la razonabilidad y sensatez de los actos legislativos; (2) en armonía con el resto de las leyes y disposiciones aplicables a la administración fiscal de los municipios; (3) interpretando liberalmente cualquier facultad concedida a los municipios, y (4)

---

([16]) El Art. 7.011(b) autoriza al municipio para que al cierre de libros pueda:

"(b) Proveer para que los déficit acumulados por el municipio a la fecha de efectividad de esta ley, una vez cuantificados y registrados en los registros de contabilidad del municipio, se amorticen en un período de treinta (30) años. *La cantidad equivalente a la amortización anual se consignará como cuenta de gastos en los presupuestos anuales del municipio con déficit acumulados.*" (Énfasis suplido.) 21 L.P.R.A. sec. 4311(b).

([17]) La definición de "refinanciar" incluida en este mismo diccionario contempla la acepción de dicho término en el sentido de pagar obligaciones contraídas con dinero disponible sin tener que incurrir en nueva deuda. Al definir el vocablo *financiar*, lo equipara a *refinanciar*:

"Aportar el dinero necesario para una empresa. Sufragar los gastos de una actividad, obra, etc. También 'refinanciar'." I. Rivera García, *Diccionario de Términos Jurídicos*, 2da ed., New Hampshire, Ed. Equity, 1985, pág. 105.

en busca del resultado más sensato, lógico y razonable que represente la intención del Legislador.

A pesar de la ambigüedad con que el vocablo "refinanciamiento" ha sido utilizado en esta legislación, el Banco sostiene que sólo puede ser interpretado como la sustitución de deudas ya contraídas por deudas nuevas. El Tribunal de Circuito de Apelaciones acoge la posición del Banco y en la pág. 50 de su sentencia resume su postura:

> En lo que respecta al exceso a que se refiere la [S]ección [2] de la Ley Núm. 66, *supra*, en armonía con el propósito que la inspira y basado en los fundamentos antes expuestos, debemos concluir que la Asamblea Legislativa pretendía que los municipios utilizaran el exceso en el Fondo de Redención como garantía o colateral para financiar, según hemos interpretado este término con anterioridad, las deudas operacionales existentes y acumuladas, ya fuese con el BGF o con la banca privada. Al contemplar que el exceso se utilizará para garantizar los nuevos préstamos u obligaciones a largo plazo, evidentemente pretendía que ese excedente continuara depositado en el Fondo de Redención, no que los municipios recibieran en efectivo el exceso que pudiera producirse en el Fondo de Redención que se refiere la [S]ección [2] de la Ley Núm. 66, *supra*. Ello nos luce como una medida prudente, pues permite que los municipios se beneficien del exceso, si alguno hubiese, sin consumirlo, a la vez que éste se mantiene en el Fondo de Redención para cumplir los propósitos que originaron su creación: El pago de los bonos. (Énfasis suprimido.)

La interpretación restrictiva de la ley que sugiere el Banco y que adopta el Tribunal de Circuito de Apelaciones presenta problemas de lógica interpretativa y evidencia la impracticabilidad de tal postura.

El problema central de la interpretación es que requiere que el Municipio tenga que endeudarse más para poder utilizar los *excesos* en el Fondo de Redención que por virtud del Art. 13 de la Ley Municipal de Préstamos, *supra*, le pertenecen. En otras palabras, aunque el Municipio tiene fondos suficientes en dicho fondo para pagar el servicio de la deuda por el año en curso y por los próximos doce (12) meses, la interpretación del Banco lo obliga a continuar

endeudándose para cumplir con sus deudas operacionales cuando su fondo general no es suficiente para ello. Mientras tanto, paradójicamente, continúan acumulándose excesos en cantidades millonarias en la cuenta de San Juan en el Fondo de Redención. La postura del Banco definitivamente va en detrimento de la salud financiera de los municipios, en particular el de San Juan, que no sólo termina con más deudas, sino que tiene que pagar intereses adicionales por los préstamos que se ve obligado a hacer con su propio dinero como colateral. Esta alternativa, en última instancia, resulta en un perjuicio a los municipios y a sus ciudadanos que pagan las contribuciones y que son los acreedores de los servicios que debe ofrecer cada municipio. En fin, la alternativa que el Banco plantea es contraria a las más sanas normas de política fiscal y está reñida con el criterio de interpretación lógica de la ley. Como ya expresamos, el Legislador en 1985 se enfrentaba a dos (2) problemas fundamentales en las finanzas municipales: (a) el creciente endeudamiento de los municipios, y (b) la falta de fondos operacionales para proveer adecuados servicios a la ciudadanía. Frente a esta situación, no tiene sentido lógico alguno que, contando con excesos disponibles en el Fondo de Redención, sólo puedan ser utilizados para endeudarse más y no para pagar las deudas que tiene.

Por otra parte, si la Sec. 1 de la enmienda de 1985 ya autorizaba la emisión de una deuda pública para pagar gastos ordinarios, sin necesidad siquiera de ofrecer una garantía colateral, ¿qué necesidad tendría el Municipio de endeudarse más al utilizar el exceso del Fondo de Redención como colateral? Este planteamiento se refuerza ante la existencia de otros mecanismos de endeudamiento para los gastos operacionales ya previstos en la ley. Por ejemplo, el Art. 9.002 de la Ley de Municipios Autónomos, *supra*, autoriza a los municipios a contratar empréstitos en forma de anticipos de la contribución básica sin la necesidad de ofrecer colateral de clase alguna. 21 L.P.R.A. sec. 4402.

La posición del Banco muestra, además, una contradicción intrínseca en su interpretación del estatuto. Al adoptar esta interpretación, el Tribunal de Circuito de Apelaciones sostiene que la C.A.E. sólo puede utilizarse para un propósito, a saber, "responder única y exclusivamente del pago de las deudas evidenciadas por bonos o pagarés en anticipación de bonos". Sentencia del Tribunal de Circuito de Apelaciones, pág. 41. No obstante, al interpretar la citada Ley Núm. 66, dicho foro indica que el *exceso* en el Fondo de Redención puede utilizarse como garantía colateral de los préstamos que los municipios otorguen con el propio Banco o con la banca privada. Al utilizar el exceso como colateral de un préstamo privado se impone sobre éste un gravamen que sería preferente a aquel que por ley se impone para el pago de los bonos o los pagarés en anticipación de bonos. Este resultado derrota el argumento de que el exceso sólo puede responder por empréstitos municipales. Si el Municipio incumple el préstamo con un banco privado, esta institución ejecutaría el gravamen adjudicándose dichos fondos.

En caso de que el mecanismo de *refinanciamiento* sea que el propio Banco le preste el dinero en el Fondo de Redención a los municipios, también surge la situación de que el dinero sale del citado fondo y deja de estar allí "intacto" para responder exclusivamente por las deudas por empréstitos. No existe, por lo tanto, manera de que dichos excesos estén únicamente dispuestos para responder por los empréstitos municipales según la definición adoptada por el Banco y el Tribunal de Circuito de Apelaciones, en contradicción con sus propios argumentos sobre el uso exclusivo de la C.A.E.

■ Reconocemos que la C.A.E. tiene como propósito principal el pago del principal y de los intereses de la deuda pública municipal. Pero una vez se cumple con ese propósito, al reservarse para el pago de la deuda vencida y aquella que vence por los próximos doce (12) meses, como

exige el Art. 13 de la Ley Municipal de Préstamos, *supra*, se crea un exceso. Resulta irrazonable una·interpretación de la ley que no permita *nunca* la utilización de dicho exceso para pagar las obligaciones operacionales contraídas, independientemente de la cuantía acumulada en dicho fondo.

Por otro lado, la interpretación del Tribunal de Primera Instancia de que el Municipio puede utilizar los *excesos* es compatible con una sana política fiscal, pues representa el mejor balance entre el interés gubernamental de garantizar el pago de los bonos emitidos y el interés del municipio de pagar sus deudas operacionales sin endeudarse más y así poder disponer de más fondos operacionales para proveer los servicios que debe ofrecer a la ciudadanía.

 Concluimos que la Sec. 2 de la Ley Núm. 66, *supra*, al disponer que "[t]odo municipio que tenga excesos en el Fondo de Redención de la Deuda podrá *utilizar dichos excesos para el refinanciamiento* de otras deudas u obligaciones contraídas", se refiere al uso de dichos excesos —sobre los cuales ya el Art. 13 de la Ley Municipal de Préstamos, *supra*, disponía su remisión a los municipios— para *financiar* o pagar obligaciones contraídas por los municipios. Este sentido es compatible con el uso que en ocasiones el Legislador le ha adjudicado a *refinanciamiento*. Además, ésta es la única interpretación que armoniza con el Art. 13 vigente, con el esquema de autonomía municipal y representa el más lógico y sensato propósito legislativo.

 Por todo lo anterior, acogemos el criterio del Tribunal de Primera Instancia de que "[l]a única limitación que impone la Ley 66 es que los municipios no usen el exceso de la reserva de la que habla la sección 932 [el Art. 13 de la Ley Municipal de Préstamos] para contraer deudas adicionales, y embarcarse en nuevos proyectos, sino para pagar deudas ya existentes, que constituyen el pro-

blema financiero principal de estos".[18] Esta interpretación, además, armoniza a cabalidad con el esquema de mayor autonomía fiscal de los gobiernos municipales incorporado en la reforma municipal.

## V

*Experiencia particular de la C.A.E. en San Juan*

Aunque la narrativa antes expuesta dispone de los méritos del recurso ante nos, a modo de epílogo atendemos las preocupaciones del Banco de que acceder a lo solicitado por el Municipio provocaría un descalabro financiero en las finanzas municipales. Esta aseveración no tiene base alguna en la experiencia histórica del Municipio. Desde 1980 los recaudos anuales de la C.A.E. en San Juan exceden lo necesario para responder por el servicio de la deuda. Ese sobrante se ha ido acumulando en el Fondo de Redención. La cantidad total acumulada aumenta cada año y hoy la cuenta del Municipio asciende a más de veinte millones de dólares ($20,000,000). El propio Informe Sobre la Deuda Pública de 1994, preparado y presentado por el Banco ante las Comisiones de Hacienda de la Cámara y el Senado, refleja el patrón acumulativo en el caso de San Juan. En la Tabla 14 de dicho informe, el Banco muestra que, contrario a lo que ocurría con otros municipios, San Juan no tenía ni un solo centavo de préstamos operacionales. Según el informe, la deuda pública total de San Juan era de $51,660,000, de los cuales ese año vencía una cantidad total de $9,693,571. Las contribuciones cobradas del tipo C.A.E. ascienden para ese mismo año a la cantidad de $11,288,510, para una diferencia positiva de $1,594,939, que se suma a todos los sobrantes ya acumulados anteriormente en el Fondo de Redención.

---

[18] (Énfasis suprimido.) Sentencia del Tribunal de Primera Instancia, pág. 12.

La evidencia presentada ante el tribunal de instancia, y corroborada por las partes en la vista ante nos, demuestra que el Municipio no ha tenido problema alguno con el pago puntual del principal y de los intereses de la deuda pública, al menos en los últimos diez (10) años. Más bien, durante este tiempo, el Municipio ha acumulado paulatina e ininterrumpidamente sobrantes en el Fondo de Redención. Por otro lado, de la audiencia celebrada ante nos, y a preguntas de uno de los Jueces de este Tribunal, el Banco aceptó que ningún municipio ha tenido problemas de déficit en el Fondo de Redención y, por ende, no ha estado en riesgo de incumplir su deuda pública.([19]) Por lo tanto, las preocupaciones del Banco son infundadas. Más bien reflejan la visión tradicional de un gobierno centralizado que fue expresamente rechazada por el nuevo ordenamiento de la Reforma Municipal de 1991.

## VI

Por las razones expuestas anteriormente, se revoca la sentencia emitida por el Tribunal de Circuito de Apelaciones. Se devuelve el caso al Tribunal de Primera Instancia para que sin demora determine la cuantía que corresponde ser remitida al Municipio de San Juan, conforme a los pronunciamientos antes vertidos.

*Se dictará la sentencia correspondiente.*

---

([19]) Sobre la preocupación del Banco con respecto al pago de empréstitos de otros municipios, resultan ilustrativas las preguntas sobre este aspecto, formuladas al representante legal del Banco en la vista oral:

"Hon. Rebollo López:

"Que usted sepa o que sepa[n] los abogados del C.R.I.M. cuántos municipios de los ... 72 municipios que hay en Puerto Rico, han tenido problemas con su Fondo de Redención. O sea, porque claro, en el caso de San Juan, sabemos que es un Municipio grande y poderoso y puede ser distinto a un municipio pequeño. ¿Cuántos municipios, si alguno, han tenido problemas de déficit con su [F]ondo de [R]edención, [en que el C.R.I.M. haya tenido que [tomar] de otro dinero para poder completar el Fondo de Redención?]

"Lic. García Solá:

"La contestación, su señoría, es ninguno." Vista de 19 de marzo de 1996, pág. 42.

El Juez Asociado Señor Corrada Del Río se inhibió.