

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Arq. Daniel Frías – The Sembler Company of Puerto Rico<br><br>          Recurridos<br><br>               v.<br><br>Gobierno Municipal Autónomo de Carolina; Oficina Municipal de Permisos Urbanísticos<br><br><br>          Peticionarios | Certiorari<br><br>2012 TSPR 98<br><br>185 DPR ____ |

Número del Caso: CC-2007-232


Fecha: 6 de junio de 2012


Tribunal de Apelaciones:

        Región Judicial de Carolina


Abogado de la Parte Peticionaria:

               Lcdo. Ramón Bauzá Higuera


Abogado de la Parte Recurrida:

               Lcdo. Daniel Martínez Oquendo



Materia: Ley de Municipios Autónomos Discreción de la Oficina Municipal de Permisos en la otorgación de permisos de uso, anteproyectos y permisos de construcción a la luz de las políticas de ordenación territorial establecidas en legislación y reglamentos.

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | *Certiorari* |
|---|---|---|
| ARQ. DANIEL FRÍAS – THE SEMBLER COMPANY OF PUERTO RICO<br><br>Recurridos<br><br>v.<br><br>GOBIERNO MUNICIPAL AUTÓNOMO DE CAROLINA; OFICINA MUNICIPAL DE PERMISOS URBANÍSTICOS<br><br>Peticionarios | **Núm.:** <u>CC-2007-0232</u> | |

Opinión del Tribunal emitida por el Juez Asociado señor FELIBERTI CINTRÓN


En San Juan, Puerto Rico, a 6 de junio de 2012.

El presente recurso nos brinda la oportunidad de expresarnos en torno a las facultades concedidas a las Oficinas Municipales de Permisos, en virtud de la Ley de Municipios Autónomos de Puerto Rico de 1991 (Ley de Municipios Autónomos),[1] para atender asuntos concernientes a permisos de uso, anteproyectos y permisos de construcción, entre otros, dentro de sus lindes territoriales. Específicamente nos corresponde determinar si al evaluar una Consulta sobre Conformidad con el Reglamento de Zonificación de Puerto Rico (Reglamento de

---

[1] Ley Núm. 81-1991 (21 L.P.R.A. sec. 4001 *et seq.* (2005 y Supl. 2010)).

Zonificación)[2] aprobado por la Junta de Planificación de Puerto Rico (Junta de Planificación) con el fin de establecer un comercio en un área de facilidades vecinales de una urbanización, dichos organismos municipales tienen la discreción de tomar en cuenta factores y políticas de ordenación territorial según establecidas mediante legislación, así como reglamentación promulgada por la Junta de Planificación, por la Administración de Reglamentos y Permisos (A.R.Pe.)[3] y por el propio municipio; o si vienen obligadas a otorgar los permisos de forma ministerial por el mero cumplimiento de la parte concernida con los criterios del distrito del que se trate.

En el caso ante nos, el Municipio Autónomo de Carolina aduce contar con discreción para hacer una evaluación detenida a los fines de determinar si procede la aprobación de la referida consulta. El dueño del predio y el arquitecto que desarrolló la propuesta alegan que dicho municipio viene obligado a aprobar su consulta ministerialmente, puesto que, según estos, el proyecto propuesto cumple con los criterios de zonificación aplicables al predio en cuestión.

---

[2] Reglamento Núm. 6211, Departamento de Estado, 5 de octubre de 2000. El Reglamento de Zonificación fue anulado por el Reglamento de Calificación de Puerto Rico, Reglamento Núm. 7511, Departamento de Estado de 29 de mayo de 2008. Unos meses más tarde, es decir, el 11 de diciembre de 2008 el Reglamento Núm. 7511 fue anulado por el Reglamento Núm. 7628.

[3] Hoy día conocida como la Oficina de Gerencia de Permisos, en virtud de lo dispuesto en la Ley Núm. 161-2009, según enmendada (23 L.P.R.A. sec. 9011 *et seq.* (2011)) (Ley 161).

**I**

De entrada, es preciso señalar que a pesar de que el predio objeto de la controversia ante nos aparece calificado como Distrito Residencial 3 (Distrito R-3), el mismo está destinado para facilidades vecinales y usos accesorios, por lo que la consulta propuesta debe ser evaluada conforme a los criterios pautados para un Distrito Comercial de Servicios Vecinales (Distrito C-6). Conforme al Reglamento de Zonificación, los Distritos R-3 son distritos que "se establece[n] para clasificar áreas residenciales… en donde se permitirán diferentes tipos de viviendas en solares de trescientos (300) metros cuadrados o más." Sec. 13.01 del Reglamento de Zonificación. Por otro lado, los Distritos C-6 "se establece[n] para clasificar las facilidades comerciales desarrolladas conforme a los requerimientos del Reglamento sobre Lotificación y Urbanizaciones…". Sec. 26.01 del Reglamento de Zonificación.

Teniendo como trasfondo los conceptos de zonificación antes desglosados, pasamos a pormenorizar los hechos que dan lugar al recurso antes nos.

El 10 de abril de 2001 el Arq. Daniel Frías y The Sembler Company of Puerto Rico (Sembler o los recurridos) presentaron una Solicitud de Consulta sobre Conformidad con el Reglamento de Zonificación, Solicitud Número 01-

762-A (Consulta sobre Conformidad),[4] ante el Gobierno Municipal Autónomo de Carolina (Municipio) y la Oficina Municipal de Permisos Urbanísticos (OMPU) (en conjunto, los peticionarios). Mediante la misma proponían la construcción de un edificio comercial de dieciséis mil ochocientos pies cuadrados (16,800 p$^2$), para ubicar una tienda de venta al detal para la empresa Walgreens. Dicha edificación habría de ser erigida en un predio de siete mil ochocientos ochenta y siete metros (7,887 m), de los catorce mil ochocientos sesenta y seis metros cuadrados (14,866 m$^2$) que formaban parte de un área reservada para servicios vecinales y usos accesorios de la Urbanización Villa Carolina, Tercera Sección, Etapa D.[5] Sin embargo, luego de la correspondiente evaluación, el 14 de junio de 2001 la OMPU emitió una Resolución denegando dicha solicitud.

---

[4]    En los escritos obrantes en el expediente del recurso ante nos, así como en las determinaciones emitidas por la Junta de Apelaciones de Construcciones y Lotificaciones (JACL) y por el Tribunal de Apelaciones se utilizan indistintamente los términos Consulta o Anteproyecto para referirse a la solicitud presentada ante la Oficina Municipal de Permisos Urbanísticos (OMPU) por Sembler. El Reglamento de Zonificación, en su pág. 5, define anteproyecto como "[f]orma preliminar de un plano de construcción de obras, así como de estructuras, preparado por un profesional autorizado en Ley para continuar con las próximas etapas, que se somete a la ARPE o a un Municipio Autónomo, **para determinar si cumple con las leyes y reglamentos aplicables**". (Énfasis nuestro).

[5]    Es meritorio mencionar que ya previamente el 5 de enero de 2001 Sembler había presentado una solicitud similar para la ubicación de una Farmacia Walgreens en la misma propiedad. Dicha solicitud fue denegada mediante una Resolución emitida el 15 de marzo de 2001, bajo fundamentos de ordenación territorial y por no haberse presentado un Certificado de Necesidad y Conveniencia (CNC) otorgado por el Departamento de Salud que los autorizara a operar la farmacia. Curiosamente, aunque los recurridos desistieron ante la OMPU del proceso para establecer una farmacia y optaron por solicitar un permiso para la eventual construcción de una tienda de ventas al detal de la misma cadena, el 16 de octubre de 2001, es decir, paralelo a los trámites del caso de autos ante la JACL, Walgreens of PR, Inc. inició un procedimiento ante el Departamento de Salud para obtener el mencionado CNC para operar una farmacia en la referida localidad. El 10 de agosto de 2004 el Secretario de Salud concedió, finalmente, el referido CNC.

En su determinación, la OMPU señaló que la propiedad donde se proponía la construcción del proyecto era un área destinada para usos accesorios de la Urbanización Villa Carolina y que la misma estaba zonificada como Distrito R-3. Sostuvo que, de acuerdo al Reglamento de Zonificación, en distritos zonificados como R-3 no está permitida la operación de tiendas de ventas al detal. Además, que la Oficina de Planificación del Municipio Autónomo de Carolina (OPMAC) no había dado su endoso al proyecto y que, por lo tanto, el Comité de Permisos del Municipio recomendaba que se denegara la Consulta sobre Conformidad. A pesar de que la Resolución resulta un tanto escueta en cuanto a los fundamentos que dieron base para la denegatoria del proyecto, en la misma se indica que tanto la OPMAC, así como su Comité de Permisos, habían realizado una evaluación del proyecto en cuestión dentro del marco de su especialización y habían recomendado la denegación del mismo.

Inconformes con tal determinación, los recurridos solicitaron reconsideración de la misma el 5 de julio de 2001 ante la OMPU. No obstante, dicha solicitud fue rechazada de plano el 8 de agosto de 2001.

Así las cosas, el 10 de agosto de 2001 Sembler presentó un escrito de apelación ante la otrora Junta de

Apelaciones de Construcciones y Lotificaciones (JACL).[6]  En el mismo planteó que el predio objeto de la Consulta sobre Conformidad, a pesar de estar zonificado como Distrito R-3 tiene, a su vez, una clasificación de usos accesorios, por lo que, conforme al Reglamento sobre Facilidades Vecinales aprobado por la Junta de Planificación (Reglamento sobre Facilidades Vecinales),[7] se contemplaba, igualmente, el establecimiento de comercios.  Añadió que el Municipio había aprobado los permisos para dos (2) establecimientos de comida (Wendy's y Sizzler) ubicados en esa misma área,[8] por lo que correspondía actuar de igual forma y aprobar ministerialmente su Consulta sobre Conformidad.[9]

Tras varios trámites procesales ante la JACL, incluyendo la presentación de un Informe de Conferencia Preliminar entre Abogados, el 1 de agosto de 2005 se celebró una vista administrativa.  En la misma, las partes informaron al mencionado foro que, en ausencia de

---

[6]      Recientemente, la Asamblea Legislativa aprobó la Ley para la Reforma del Proceso de Permisos de Puerto Rico, Ley 161, con el propósito de mejorar la calidad y la eficiencia en la evaluación de las solicitudes de permisos de construcción en Puerto Rico.  23 L.P.R.A. 9011 n. (2011).  Aun cuando dicho estatuto reformó y derogó todas las disposiciones de la Ley Núm. 76 de 24 de junio de 1975, mediante la misma se creó un organismo equivalente a la JACL, al cual se le designó como Junta Revisora de Permisos y Usos de Terrenos (Junta Revisora).  En los procesos ante la Junta Revisora, tal como ocurría en los procedimientos ante la JACL,  se vislumbra el derecho de las partes a someter prueba adicional que le permita a dicho organismo apelativo administrativo adjudicar el caso, a la vez que le faculta a revisar las determinaciones de hechos y conclusiones de derecho en todos sus aspectos.  23 L.P.R.A. secs. 9022c y 9022d (2011).

[7]      Reglamento Núm. 876, Departamento de Estado, 17 de mayo de 1963.

[8]      Alegadamente de forma ministerial.

[9]      En uno de los memorandos de derecho presentado ante la JACL, Sembler aclara que el único permiso concedido por la OMPU fue el del restaurante Wendy's, ya que los permisos otorgados para establecer el restaurante Sizzler se hicieron a través de la Administración de Reglamentos y Permisos (A.R.Pe.).

controversias de hechos que requirieran ser dirimidas, entendían que los planteamientos de derecho podían resolverse mediante la presentación de memorandos por ambas partes. La JACL expresó su anuencia a lo solicitado por las partes y concedió un término para que éstas presentaran sus memorandos simultáneamente.

En su memorando, Sembler reprodujo los planteamientos esgrimidos en todos sus escritos previos ante la JACL, a los efectos de que la aprobación del proyecto procedía de forma ministerial ya que, alegadamente, éste cumplía con todos los requisitos aplicables al Distrito C-6. Insistió, además, en el hecho de que los terrenos donde se proponía la construcción de la tienda Walgreens para la venta de artículos al detal estaban clasificados para usos accesorios, por lo que estaba autorizado el establecimiento de comercios.

Por su parte, el Municipio y la OMPU expusieron en su memorando de derecho que, aun cuando reconocían que al estar el predio clasificado para usos accesorios donde se permitía el uso comercial, ellos poseían discreción para denegar o determinar la incompatibilidad de proyectos, tomando en consideración y evaluando diversos criterios aplicables a dichos predios. Sostuvieron que la reglamentación relevante al desarrollo de dichos terrenos les concede facultad para determinar el tipo de comercio a ubicarse "tomando en consideración la magnitud, tipo, naturaleza o localización de dicho proyecto, las vías de

tránsito existente[s] y propuestas, así como la existencia de otros negocios establecidos". Manifestaron que, a pesar de que los reglamentos concernientes vislumbraban el desarrollo de tiendas de ventas al detal en las áreas destinadas para servicios vecinales, el proyecto bajo su evaluación era de una naturaleza, finalidad y envergadura totalmente distinta a los objetivos que se pretendían alcanzar en los predios en cuestión. Explicaron que esto, unido al conjunto de políticas públicas atinentes a la planificación urbana y al no endoso por parte de la OPMAC, fue lo que los llevó a denegar la Consulta sobre Conformidad.

El 26 de septiembre de 2006 la JACL emitió una Resolución revocando la denegatoria de la OMPU. Basó su determinación estrictamente en cuestiones de zonificación, enfatizando que el Municipio había errado al utilizar en su evaluación criterios concernientes a un Distrito R-3, cuando el predio en cuestión era uno "comercial". A juicio de la JACL Sembler cumplió con la reglamentación vigente.

Considerando errada la determinación de la JACL, el 26 de octubre de 2006 los peticionarios sometieron un recurso de revisión administrativa ante el tribunal apelativo intermedio. Sostuvieron, al igual que lo habían hecho ante la OMPU, que el proyecto de los recurridos de establecer una tienda de ventas al detal para la cadena Walgreens no cumplía con los objetivos que se pretendía

alcanzar al destinar dicho predio como un área de facilidades vecinales y usos accesorios, tomando en consideración la naturaleza, finalidad y envergadura del mismo. Alegaron que la determinación de la JACL, al revocar su denegatoria y autorizar la Consulta sobre Conformidad, resultaba ser una arbitraria e irrazonable, puesto que únicamente se había tomado en consideración si el comercio a establecerse cumplía con las disposiciones relativas a los Distritos C-6. Además, que una evaluación completa del derecho aplicable requería, igualmente, la consideración de las disposiciones de la Ley Núm. 25 de 8 de junio de 1962, según enmendada, 23 L.P.R.A. secs. 30a *et seq.* (2008) (Ley 25), los reglamentos de la Junta de Planificación aplicables y las políticas públicas contenidas en el Plan de Usos de Terrenos de Puerto Rico, el Plan de Usos de Terrenos de la Región Metropolitana de San Juan y el Plan de Ordenación Territorial de Carolina, directrices que ellos habían aquilatado al emitir su decisión. Por lo tanto, solicitaron al Tribunal de Apelaciones que revocara y dejara sin efecto la determinación de la JACL.

El 10 de enero de 2007 los recurridos presentaron su alegato en oposición al recurso de revisión administrativa. Señalaron que tanto en el Plano de Inscripción de la Urbanización Villa Carolina como en el Mapa de Zonificación del Municipio, el predio en cuestión aparecía clasificado como para usos accesorios. Por lo

tanto, sostuvieron que según las disposiciones del Reglamento sobre Facilidades Vecinales, dicha propiedad debía ser destinada, entre otros propósitos, para el establecimiento de facilidades comerciales. Además, dado que el proyecto propuesto cumplía con las disposiciones de dicho reglamento, la autorización de la Consulta sobre Conformidad procedía de forma ministerial.

Mediante Sentencia emitida el 24 de enero de 2007, el Tribunal de Apelaciones confirmó la Resolución recurrida. Fundamentó su determinación, principalmente, en la deferencia concedida a las decisiones administrativas.

No conformes aún con dicho dictamen, el 13 de febrero de 2007 los peticionarios presentaron una "Moción de Reconsideración" ante dicho foro. Sin embargo, la misma fue declarada *No Ha Lugar* el 22 de febrero del mismo año.

De esa determinación, los peticionarios acuden ante nos planteando como único señalamiento de error lo siguiente:

> **ERRÓ EL TRIBUNAL DE APELACIONES… AL AUTORIZAR UN PROYECTO QUE ES DEFINITIVAMENTE CONTRARIO A LA NORMATIVA QUE, RESPONDIENDO A PROPÓSITOS ESTATUTARIOS Y DE PLANIFICACIÓN URBANA, INSTITUYE Y RIGE LOS PREDIOS PARA FACILIDADES VECINALES COMERCIALES Y A LA PROPIA RESOLUCIÓN DE LA JUNTA DE PLANIFICACIÓN SOBRE LA DISTRIBUCIÓN Y USO A DÁRSELE A LOS PREDIOS DE FACILIDADES VECINALES DE LA URB. VILLA CAROLINA, TERCERA SECCIÓN, ETAPA D, AL APROBARSE EL DESARROLLO DE LA MISMA.**

Una vez evaluado el recurso, decidimos expedir el auto de *certiorari* solicitado. Teniendo el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II**

**A. Ley de Municipios Autónomos**

A inicios de la década de los noventa, y muy en particular para el 1991, la Asamblea Legislativa aprobó varias piezas de legislación dirigidas a reformar integralmente la constitución, organización, administración y el funcionamiento de los gobiernos municipales de Puerto Rico. "Esta reforma abarcadora del ordenamiento municipal otorgó a los municipios un mayor grado de autonomía fiscal y de gobierno propio, además de nuevos instrumentos administrativos y fiscales." Mun. San Juan v. Banco Gub. Fomento, 140 D.P.R. 873, 885 (1996) (citando a Alcalde Mun. de Humacao v. Ramos Cofresí, 140 D.P.R. 587, 595 (1996)). La misma estuvo dirigida a fomentar la autonomía gestora del gobierno municipal permitiendo, de ese modo, una atención más directa y eficaz, a los asuntos, problemas y necesidades de sus habitantes. Unlimited Storage Corporation v. Municipio Autónomo de Guaynabo Oficina de Permisos Urbanísticos, 2011 T.S.P.R. 193, 183 D.P.R. ___ (2011).

Entre la legislación más significativa se aprobó la Ley de Municipios Autónomos, mediante la cual se aspiraba a abandonar el esquema centralizado de gobierno que imperaba para ese entonces, proveyendo, de ese modo, una mayor autonomía administrativa y fiscal a los municipios encaminada a potenciar su desarrollo a nivel local.

Uno de los propósitos perseguidos por la Ley de Municipios Autónomos era establecer una nueva política pública gubernamental dirigida a "otorgar a los municipios el máximo posible de autonomía y proveerles las herramientas financieras, **así como los poderes y facultades necesarias para asumir una función central y fundamental en su desarrollo urbano, social y económico**". Art. 1.002 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4001 n. (2005) (énfasis nuestro). Véase, además, E.L.A. v. Crespo Torres, 180 D.P.R. 776, 787 (2011); Mun. San Juan v. Banco Gub. Fomento, *supra*, pág. 886.

Como parte de la reforma municipal se facultó a los municipios a "ordenar, reglamentar y resolver cuando sea necesario o conveniente para atender las necesidades locales y para su mayor prosperidad y desarrollo". Art. 2.004 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4054 (Supl. 2011). Dentro de dichas facultades se le autorizó a establecer la política, estrategias y planes dirigidos a ordenar su territorio y a la conservación de sus recursos, todo ello con el fin de alcanzar un desarrollo óptimo de sus suelos. Art. 2.004(h) de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4054(h) (Supl. 2011).

En la delegación de poderes y facultades del Gobierno Central a los municipios, se autorizó, mediante la Ley de Municipios Autónomos, la transferencia de algunas de las facultades de la Junta de Planificación y de la A.R.Pe. a

los entes municipales. Lo anterior con el propósito de que sean éstos mismos los que atiendan los asuntos de ordenación territorial, incluyendo querellas, autorizaciones y permisos dentro de sus límites territoriales. En su Artículo 13.012, 21 L.P.R.A. sec. 4610 (2005), la Ley de Municipios Autónomos desglosa, desde una Jerarquía I a una Jerarquía V, las distintas facultades de ordenación territorial que pueden ser transferidas a los municipios.[10] Éstas serán transferidas por medio de un convenio que, además de especificar las facultades transmitidas al municipio, establecerá las limitaciones en los poderes delegados.

Antes de que la Junta de Planificación y la A.R.Pe. puedan efectuar la transferencia de las facultades, el municipio tendrá que crear una Oficina de Permisos. Art. 13.012 de la Ley de Municipios Autónomos, *supra*. Las funciones de dicha oficina serán, entre otras:

    (a)   Tramitar solicitudes de autorizaciones y permisos de conformidad a las facultades transferidas al municipio mediante convenio.

    (b)   ….

    (c)   Celebrar vistas públicas relacionadas con la otorgación de autorizaciones o permisos y efectuar todas las actividades incidentales a las mismas.

    (d)   ….

---

[10] Sobre el particular, el Secretario de Justicia expresó en su Opinión Núm. 17 de 1992: "Previo a la aprobación de la Ley de Municipios Autónomos, el proceso de planificación y ordenación de los usos del terreno recaía casi exclusivamente en la Junta de Planificación. Esta función queda ahora compartida por los municipios, a los cuales se les han conferido las facultades y responsabilidades para llevarlo a cabo, en coordinación con las agencias del Gobierno central". No obstante, es preciso recordar que en nuestro ordenamiento jurídico las opiniones del Secretario de Justicia tienen carácter persuasivo, más no obligan a los tribunales. E.L.A. v. Crespo Torres, 180 D.P.R. 776 (2011).

Art. 13.013 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4611 (2005).

Las facultades transferidas deben ser ejercidas "conforme a las normas y procedimientos establecidos en la legislación, reglamentación y política pública aplicable a la facultad transferida, incluyendo [los artículos de la Ley Núm. 170 de 12 de agosto de 1988, mejor conocida como] 'Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico' [3 L.P.R.A. sec. 2101 *et seq.*]". Art. 13.012 de la Ley de Municipios Autónomos, *supra*.

La Oficina de Permisos será dirigida por un Oficial de Permisos, el cual, previo a tomar una decisión discrecional sobre alguna de las facultades que le hayan sido transferidas, requerirá la formación de un Comité de Permisos. "El Comité de Permisos evaluará las distintas autorizaciones o permisos que requieran variaciones de construcción o de instalación de rótulos y anuncios, excepciones, o determinaciones sobre usos o estructuras no conformes legales, y emitirán su recomendación escrita al Oficial de Permisos, quien decidirá la aprobación o denegación de tal acción". Art. 13.013 de la Ley de Municipios Autónomos, *supra*.

En asuntos de ordenación de los suelos municipales, además de la transferencia de facultades de la Junta de Planificación y la A.R.Pe., la Asamblea Legislativa también autorizó a los municipios a adoptar un Plan de

Ordenación Territorial que orientara la ordenación integral y estratégica del territorio municipal y que enunciara la política pública sobre el desarrollo y uso de sus suelos. Arts. 13.004 y 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. secs. 4602 y 4603 (2005 y Supl. 2011); Unlimited Storage Corporation v. Municipio Autónomo de Guaynabo Oficina de Permisos Urbanísticos, *supra*. Su propósito será, entre otros, ordenar el suelo urbano, persiguiendo un:

    (1)    desarrollo balanceado de usos a través de la ciudad, **incorporando usos diversos pero compatibles** en la misma para lograr comunidades mixtas donde se posibilite el acceso peatonal a los diferentes usos;

    (2)    fortalecimiento de la estructura económica, social y física de cada barrio o vecindario, de acuerdo a sus características particulares, **equipando los distintos barrios o vecindarios de los servicios y variedad de usos necesarios** o deseables;

            ....

Art. 13.002(f) de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4601 n. (2005) (énfasis nuestro).

Los Planes de Ordenación "protegerán los suelos, promoverán el uso balanceado, provechoso y eficaz de los mismos y propiciarán el desarrollo cabal de cada municipio". Art. 13.004 de la Ley de Municipios Autónomos, *supra*. Su desarrollo requerirá "el estudio y la recopilación de un complejo entramado de documentos, cuyo contenido revela[rá] un **minucioso análisis de la realidad socio-espacial del municipio**". Unlimited Storage

Corporation v. Municipio Autónomo de Guaynabo Oficina de Permisos Urbanísticos, *supra* (énfasis nuestro).  Una vez los Planes de Ordenación entren en vigor, toda decisión sobre el uso de los suelos se hará de conformidad con los mismos.

El 16 de febrero de 1995 el Municipio suscribió un Convenio de Transferencias (Convenio)[11] en unión con la Junta de Planificación y la A.R.Pe., mediante el cual le fueron transferidas las facultades para otorgar ciertos permisos y autorizar consultas de ubicación de proyectos. Mediante dicho Convenio, revisado y adoptadas sus revisiones el 31 de octubre de 2000 y el 14 de mayo de 2003, el Municipio obtuvo la transferencia de competencias sobre ordenación territorial, entre las que se encuentran la autorización de anteproyectos, según lo dispuesto en el Artículo 13.012 de la Ley de Municipios Autónomos, *supra*.

Desde el primer Convenio se consignó que el mismo tenía el propósito de poner en vigor la política pública establecida por el Gobierno de Puerto Rico mediante la Ley de Municipios Autónomos, de otorgarle a los municipios la mayor autonomía posible, así como los poderes y facultades necesarios para asumir su responsabilidad de fomentar su desarrollo urbano, social y económico.

---

[11] Convenio de Transferencia de Facultades de la Junta de Planificación y la Administración de Reglamentos y Permisos del Gobierno de Puerto Rico al Municipio de Carolina.

En el mismo se dispuso que:

**Será responsabilidad fundamental de la Oficina el promover que toda estructura,** pública o privada, espacio público y/o privado u obra de construcción **reúnan los parámetros de ordenación territorial vigentes,** en conformidad con las disposiciones conferidas por la Ley de Municipios Autónomos, según enmendada.

Anejo F del Convenio de Transferencia, pág. 4 (énfasis nuestro).

Asimismo se expresó que el Municipio había adoptado desde el 18 de diciembre de 1992 un Plan Territorial[12] con el fin de propiciar un uso juicioso y un aprovechamiento óptimo de su territorio, asegurando, de este modo, el bienestar de las generaciones actuales y futuras, a la vez de promover un proceso de desarrollo ordenado, racional e integral.

### B. Reglamentación aplicable a áreas reservadas para servicios vecinales

Dentro de las autorizaciones a ser concedidas por las oficinas municipales de permisos se encuentran aquellas relativas a propuestas de desarrollos en las áreas vecinales de las urbanizaciones. Es preciso conocer que fue mediante legislación que se estableció el requisito de

---

[12] El Plan de Ordenación Territorial fue aprobado el 18 de diciembre de 1992 por la Asamblea Municipal de Carolina mediante la Ordenanza Núm. 43, Serie 1992-93-51 y por la Junta de Planificación el 28 de diciembre de 1992 por conducto de la Resolución Núm. JP-PT-20-1. El 16 de julio de 1999 la Asamblea Municipal de Carolina aprobó una revisión parcial de su Plan de Ordenación Territorial, la cual fue ratificada por la Junta de Planificación el 21 de diciembre de 2000 mediante la Resolución Núm. JP-PT-20-2. El 21 de marzo de 2006 se realizó una revisión integral al Plan de Ordenación Territorial, la cual fue suscrita por la Legislatura Municipal y el Alcalde de Carolina por medio de la Resolución Núm. 51, Serie 2005-2006-57 y adoptada por la Junta de Planificación el 13 de diciembre de 2006 mediante la Resolución Núm. JP-PT-20-5.

reservar ciertos predios de las urbanizaciones para usos accesorios. Veamos.

La Ley 25 instituyó el requisito de designar parte de las áreas destinadas para desarrollos urbanos como facilidades vecinales. Desde su aprobación, la ley vislumbró que la extensión o magnitud de tales áreas dependería del número de solares residenciales o unidades de vivienda en cada desarrollo, de modo tal que dichas facilidades se ajustaran a las **necesidades** de cada comunidad. Art. 7 de la Ley 25, 23 L.P.R.A. sec. 30g (2008).

En virtud del mandato contenido en el Artículo 7 de la Ley 25, el 17 de mayo de 1963 se aprobó el Reglamento sobre Facilidades Vecinales. En el mismo se establecía, entre otras disposiciones, que los urbanizadores tenían que preparar un anteproyecto con la distribución y uso de todos los locales que se proyectaran utilizar para fines comerciales en los predios de áreas vecinales. Establecía, además, el tipo de comercios que se podía construir, las dimensiones y la rotulación de los mismos. Sobre el particular, y en lo pertinente al caso ante nos, el reglamento arriba indicado disponía que el área de los edificios no excedería de un treinta por ciento (30%) del área del solar.

El Reglamento sobre Facilidades Vecinales fue derogado por el Reglamento de Lotificación y Urbanización de la Junta de Planificación (Reglamento de Lotificación y

Urbanización).[13]      Éste,   a   su   vez,   fue   enmendado transcurrido   sólo   unos   meses   desde   su   aprobación.[14] Posteriormente,   el   3   de   enero   de   2001   el   Secretario   de Estado   promulgó   un   nuevo   Reglamento   de   Lotificación   y Urbanización   (Reglamento   de   Planificación   Núm.   3).[15]   En   lo pertinente   al   caso   ante   nos,   la   Sección   10.04   de   este último   reglamento,   disponía   en   su   inciso   4:

> ....
>
> **4.      Instalaciones      Comerciales**-…. La Administración   del   municipio   autónomo,   **tomando en   consideración   la   magnitud,   tipo,   naturaleza   o localización   de   dicho   proyecto,   las   vías   de tránsito   existentes   y   propuestas,   la   existencia de   otros   negocios   legalmente   establecidos   en   los alrededores,   determinará   el   tipo   y   tamaño   de solar   comercial   a   desarrollarse,   conforme   al Distrito   C-6** según   definido   en   el   Reglamento   de Zonificación   de   Puerto   Rico   (Reglamento   de Planificación   Núm.   4)….
>
> ....

(Énfasis nuestro).

El   24   de   junio   de   2005   el   Departamento   de   Estado promulgó   una   nueva   versión   enmendada   del   Reglamento   de Lotificación   y   Urbanización,   la   cual   fue   adoptada conjuntamente   por   la   Junta   de   Planificación   y   A.R.Pe.[16]   A

---

[13]     Reglamento Núm. 4794, Departamento de Estado, 28 de septiembre de 1992.

[14]     El reglamento enmendado siguió llevando el mismo título y número que le fuera asignado por la Junta de Planificación al anterior, pero al ser promulgado por el Departamento de Estado el 14 de enero de 1993, se le designó como el Reglamento Núm. 4867.

[15]     Reglamento Núm. 6283, Departamento de Estado, 3 de enero de 2001.

[16]     Reglamento Núm. 6992, Departamento de Estado, 24 de junio de 2005.

esta nueva versión del Reglamento de Lotificación y Urbanización se le añadió una Sección 1.12 que dispone:

> Aquellos casos de urbanizaciones residenciales que como parte de las facilidades vecinales se hayan requerido facilidades comerciales pero que no se hayan zonificado conforme a los parámetros de uso comercial autorizado, se evaluarán tomando en consideración los criterios comerciales para los cuales se requirieron las facilidades.

Asimismo, dicho reglamento contiene la disposición referente a las instalaciones comerciales en áreas destinadas para facilidades vecinales, al igual que el reglamento anterior, la cual establece:

> ….
>
> **4. Instalaciones Comerciales**-…. La ARPE o el Municipio Autónomo, **tomando en consideración la magnitud, tipo, naturaleza o localización de dicho proyecto, las vías de tránsito existentes y propuestas, la existencia de otros negocios legalmente establecidos en los alrededores, determinará el tipo y tamaño de solar comercial a desarrollarse conforme al Distrito C-6,** según definido en el Reglamento de Zonificación de Puerto Rico (Reglamento de Planificación Núm. 4) o conforme a los Mapas de Calificación en el Plan Territorial….
>
> ….

(Énfasis nuestro).

El Reglamento de Zonificación, promulgado por el Departamento de Estado el 5 de octubre de 2000, "tiene el propósito de guiar y controlar el uso y desarrollo de los terrenos en Puerto Rico con el fin de contribuir a la seguridad, el orden, la convivencia, la solidez económica y el bienestar general de los actuales y futuros habitantes." Sec. 1.03 del Reglamento de Zonificación.

Es precisamente la Sección 1.04 de dicho reglamento la que faculta a los Municipios Autónomos a implantar las disposiciones del mismo, cuando a estos entes municipales se les hayan delegado, mediante convenio legal, facultades de la Junta de Planificación y la A.R.Pe.

El Reglamento de Zonificación reúne, en su Sección 26.00, todas las especificaciones relativas a los Distritos C-6. Este distrito en particular fue diseñado precisamente para detallar los criterios que han de guiar los desarrollos de facilidades comerciales en predios de servicios vecinales. Entre los aspectos considerados, la Sección 26.02 enumera los usos permitidos, entre los que se contemplan los comercios al detal de artículos de consumo o uso corriente en el hogar. Las Secciones 26.03 y 26.04 detallan lo concerniente a la altura de las edificaciones y densidad poblacional, respectivamente.

Las Secciones 26.05 y 26.06 disponen, a su vez, los asuntos atinentes al área de ocupación y al área bruta de piso, respectivamente. Las mismas, específicamente, establecen:

    26.05    [Á]rea de Ocupación en Distritos C-6 – El área de ocupación no excederá del treinta por ciento (30%) del área del solar.

    26.06    [Á]rea Bruta de Piso en Distritos C-6 – El área bruta de piso no excederá del sesenta por ciento (60%) del área del solar. En ningún caso el área bruta de piso de cualquier planta sobre la primera excederá el por ciento máximo de área de ocupación permitido en el distrito.

### C. Revisión de las determinaciones de las Oficinas Municipales de Permisos

Una vez el municipio toma una decisión en cuanto a las solicitudes de permisos, conforme a lo establecido en la legislación y reglamentación aplicable, su determinación debe estar sujeta a revisión.

La normativa sobre la revisión de las decisiones emitidas por las oficinas de permisos de los municipios, se encuentra recogida en el Artículo 13.016 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4614 (2005). El mismo establece, en lo pertinente al recurso ante nos:

....

Los términos, trámites, y condiciones para las solicitudes de reconsideración, de apelación o de revisión judicial de las decisiones del municipio, serán:

(a) Los aplicables a decisiones de la Administración de Reglamentos y Permisos si la competencia de que se trate le fue transferida de dicha agencia al municipio.
(b) Los aplicables a decisiones de la Junta de Planificación si la competencia le fue transferida de dicha agencia al municipio.

....

Como parte del proceso de revisión de las determinaciones de la A.R.Pe., la Asamblea Legislativa estableció, mediante la ley orgánica de dicha agencia, Ley Núm. 76 de 24 de junio de 1975, 23 L.P.R.A. sec. 71 *et seq.* (2008), un procedimiento de apelación interagencial ante la JACL, previo al trámite de revisión judicial. La JACL era un organismo administrativo de carácter cuasi judicial, cuya facultad revisora se activaba cuando una

parte directamente interesada o afectada presentaba la correspondiente apelación de una actuación, determinación o resolución de la A.R.Pe. o de algún Municipio Autónomo con facultades transferidas de dicha agencia.[17]   23 L.P.R.A. sec. 72c (2008); 21 L.P.R.A. sec. 4614 (2005); Maymí v. Gob. Mun. Aut. Ponce, 151 D.P.R. 689 (2000).

Como parte de los procedimientos ante la JACL, se contemplaba una vista, en la cual se podía presentar toda la prueba que resultara necesaria para adjudicar el caso. 23 L.P.R.A. sec. 72c(c).   "[L]a JACL pod[ía] decretar órdenes, requerimientos, resoluciones o las determinaciones que a su juicio deb[í]an dictarse y, a tal fin, 'ten[ía] los mismos poderes del funcionario u organismo de cuya actuación se apela[ba]…'".   Vélez v. A.R.Pe., 167 D.P.R. 684, 696 (2006) (énfasis omitido); 23 L.P.R.A. sec. 72c(c)(3) (2011).

Estas disposiciones permitían a la JACL considerar el caso en todos sus méritos, igual que lo hacía la agencia que actuaba en primera instancia, y realizar sus propias determinaciones de hechos y conclusiones de derecho. Vélez v. A.R.Pe., supra; Junta de Planificación v. J.A.C.L., 109 D.P.R. 210 (1979).   Es decir, la "J.A.C.L. no esta[ba] limitada a revisar únicamente la prueba que consideró el funcionario con jurisdicción original en el

---

[17]    Tal y como mencionáramos anteriormente, mediante la reforma a los procesos de permisos que introdujo la Ley 161 la JACL desapareció y la misma fue sustituida por la Junta Revisora como organismo revisor administrativo.

asunto". <u>Vélez v. A.R.Pe.</u>, *supra*, pág. 697 (cita omitida).

Anteriormente hemos establecido que disposiciones de ley similares que permiten a los organismos apelativos celebrar vistas, recibir prueba adicional a la evaluada inicialmente por la agencia y llegar a sus propias conclusiones, a base de la prueba desfilada, poseen facultades revisoras de la naturaleza de un *juicio de novo*.[18] <u>Vélez v. A.R.Pe.</u>, *supra*.

Como hemos apreciado, en el caso ante nos, por disposición explícita de la Ley Orgánica de la A.R.Pe., "[l]as decisiones adoptadas por la Administración de Reglamentos y Permisos (ARPE) [y en nuestro caso en particular por las Oficinas de Permisos Municipales con poderes delegados por la A.R.Pe.] p[odían] ser revisadas mediante un *juicio de novo* ante la Junta de Apelaciones sobre Construcciones y Lotificaciones (JACL)." J. Echevarría Vargas, <u>Derecho Administrativo Puertorriqueño</u>, San Juan, Puerto Rico, Ediciones SITUM, Inc., 2012, pág. 288 (énfasis en el original y cita omitida). "[E]l juicio *de novo*… garantiza la celebración de unos procedimientos

---

[18] Véase, por ejemplo, a <u>Granados v. Rodríguez Estrada I</u>, 124 D.P.R. 1, 19 (1989) (citando a <u>P.N.P. v. Rodríguez Estrada, Pres. C.E.E.</u>, 123 D.P.R. 1, 30-31 (1988)), en el que expresamos:

> Téngase en mente que el Art. 1.016 de la Ley Electoral de Puerto Rico, 16 L.P.R.A. sec. 3016a, le impone la obligación al Tribunal Superior de celebrar vista en su fondo, recibir evidencia y hacer sus propias determinaciones de hecho y conclusiones de derecho al revisar las decisiones de la C.E.E.  No se trata, por lo tanto, de una mera revisión limitada a cuestiones de derecho.  Se trata en realidad de un juicio *de novo*….

(Énfasis en el original y cita omitida).

nuevos que no descansan en los que pudieran haberse celebrado ante la agencia administrativa. El tribunal revisor no está atado en manera alguna por las determinaciones y conclusiones de la agencia." D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., Colombia, Ed. Forum, 2001, pág. 578.

### D. Revisión Judicial de las determinaciones administrativas

"Una vez agotado el proceso administrativo, que incluye la apelación interagencial, la decisión final deberá revisarse judicialmente dentro de los parámetros del principio de deferencia judicial…." Vélez v. A.R.Pe., supra, pág. 698 (énfasis omitido).

En un sinnúmero de ocasiones nos hemos expresado sobre la norma jurídica que establece que los dictámenes de los organismos administrativos merecen la mayor deferencia judicial. Torres Santiago v. Depto. Justicia, 181 D.P.R. 969 (2011); Asoc. Fcias. v. Caribe Specialty et al. II, 179 D.P.R. 923 (2010); Otero v. Toyota, 163 D.P.R. 716 (2005). Dicha normativa está asentada en el principio de que son los organismos administrativos los que cuentan con el conocimiento especializado sobre los asuntos que por ley se le han delegado. Íd.; Asoc. Fcias. v. Caribe Specialty et al. II, supra; JP, Plaza Santa Isabel v. Cordero Badillo, 177 D.P.R. 177 (2009).

En cuanto a las determinaciones de hechos formuladas por la agencia, hemos establecido que, como norma general, los tribunales no intervendremos con éstas, siempre y cuando surja del expediente administrativo evidencia sustancial que las sustente. Para tomar dicha determinación, los tribunales utilizaremos un criterio de razonabilidad y deferencia. Asoc. Fcias. v. Caribe Specialty et al. II, supra.

Por otro lado, las conclusiones de derecho de las agencias administrativas podrán ser revisadas por los tribunales en todos sus aspectos. Torres Santiago v. Depto. Justicia, supra; Asoc. Fcias. v. Caribe Specialty et al. II, supra. Esto no quiere decir, sin embargo, que los tribunales podamos descartar libremente las conclusiones e interpretaciones de la agencia. Torres Santiago v. Depto. Justicia, supra; Asoc. Fcias. v. Caribe Specialty et al. II, supra; Otero v. Toyota, supra. La deferencia reconocida a las decisiones de las agencias administrativas habrá de ceder, solamente, cuando la misma no esté basada en evidencia sustancial, cuando la agencia ha errado en la aplicación de la ley y cuando su actuación resulte ser una arbitraria, irrazonable o ilegal. Torres Santiago v. Depto. Justicia, supra; Asoc. Fcias. v. Caribe Specialty et al. II, supra; Otero v. Toyota, supra.

Recientemente en Ifco Recycling, Inc. v. Autoridad de Desperdicios Sólidos, 2012 T.S.P.R. 35, 184 D.P.R. __ (2012), citando a Empresas Ferrer v. A.R.Pe., 172 D.P.R.

254, 264 (2007), expusimos que la deferencia concedida a las agencias administrativas sólo cederá cuando:

>   (1) la determinación administrativa no está basada en evidencia sustancial; (2) el organismo administrativo ha errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúa arbitraria, irrazonable o ilegalmente, realizando determinaciones carentes de una base racional, o (4) cuando la actuación administrativa lesiona derechos constitucionales fundamentales….

## III

Habiendo establecido la normativa legal que gobierna el presente recurso, pasaremos a aplicar la misma a los hechos del presente caso.

En virtud de las disposiciones del Artículo 3.012 de la Ley de Municipios Autónomos, *supra*, el 16 de febrero de 1995 el Gobierno Central le transfirió al Municipio ciertas competencias de la Junta de Planificación y de la A.R.Pe. mediante un Convenio. En aras de poner en vigor las facultades delegadas, el Municipio creó la OMPU, oficina que se encargaría de tramitar todas las autorizaciones y permisos, conforme a las facultades que le fueran conferidas en el referido Convenio.

Tal y como mencionáramos anteriormente, en la presente situación de hechos, Sembler sometió una Consulta sobre Conformidad ante la OMPU el 10 de abril de 2001, atinente a la construcción de una tienda Walgreens para la venta de artículos al detal en un área destinada para

facilidades vecinales ubicada en un Distrito R-3. Cumpliendo con los procedimientos establecidos en la Ley de Municipios Autónomos, la OMPU sometió la Consulta sobre Conformidad para la correspondiente consideración por el Comité de Permisos, el cual luego de evaluar la solicitud, recomendó denegarla. Una vez recibida la recomendación del Comité de Permisos y de considerar los hechos presentados ante sí, el Director de la OMPU la ratificó, denegando, de este modo, la solicitud. Luego de otros trámites procesales, que incluyeron la revocación de la determinación de la OMPU por la JACL y la confirmación de dicha decisión por el tribunal apelativo intermedio, la controversia ha llegado ante nuestra atención.

Hoy nos toca dilucidar si, en efecto, la OMPU contaba con discreción para tomar en cuenta criterios contenidos en su Plan de Ordenación Territorial y en los Reglamentos de la Junta de Planificación aplicables al caso, o si estaba en la obligación de aprobar la Consulta sobre Conformidad solicitada por Sembler de forma ministerial como éstos últimos alegan.

Como mencionáramos, la Ley de Municipios Autónomos autoriza a los municipios a adoptar Planes de Ordenación Territorial con el propósito de proteger los suelos, promover el uso balanceado, provechoso y eficaz de los mismos y propiciar el desarrollo cabal del municipio. Dicha legislación dispone la existencia de tres (3) tipos de Planes de Ordenación Territorial que atenderán

diferentes aspectos de la ordenación del espacio municipal: Plan Territorial, Plan de Ensanche y Plan de Área. Art. 13.004 de la Ley de Municipios Autónomos, *supra*. En lo que respecta al caso ante nos, define la Ley de Municipios Autónomos, en su Artículo 13.003(s), 21 L.P.R.A. sec. 4601 (2005), que el Plan Territorial es "el Plan de Ordenación que abarca un municipio en toda su extensión territorial, que enuncia y dispone la política pública sobre su desarrollo y sobre el uso del suelo." Añade que, una vez entre en vigor el Plan Territorial, **"toda decisión sobre el uso del suelo se hará en conformidad con el mismo"**. Art. 13.005 de la Ley de Municipios Autónomos, 21 L.P.R.A. sec. 4603 (Supl. 2011) (énfasis nuestro). Véase, además, Borschow Hosp. v. Jta. de Planificación, 177 D.P.R. 545, 561 (2009).

Por otro lado, el Reglamento de Lotificación y Urbanización autoriza a los municipios a tomar en cuenta factores tales como la magnitud, tipo, naturaleza, localización, vías de tránsito existentes y propuestas y la existencia de otros negocios legalmente establecidos al otorgar o denegar los permisos para el establecimiento de comercios en áreas vecinales del territorio municipal.

Teniendo en cuenta las disposiciones estatutarias y reglamentarias antes citadas, entendemos meritorias las alegaciones presentadas por el Municipio y la OMPU en este caso. En específico, resolvemos que la evaluación de la solicitud presentada por Sembler conllevaba un ejercicio

de discreción por parte de la OMPU, que requería la ponderación de la política pública establecida por el Municipio para el uso eficiente de sus suelos y de los factores reglamentarios antes desglosados, de modo que se garantizara que el proyecto propuesto estuviese conforme con la función para la cual se había destinado el predio en cuestión. Todo lo anterior, enmarcado en el Desarrollo Preliminar que había aprobado la Junta de Planificación para habilitar esa área de la Urbanización Villa Carolina.

Cuando la JACL tuvo el caso ante su consideración, se circunscribió a dictaminar que la OMPU había errado al evaluar el proyecto dentro de los parámetros de un Distrito R-3,[19] cuando correspondía hacerlo bajo los criterios de un Distrito C-6, habida cuenta de que son éstos los criterios aplicables a predios destinados para usos accesorios.[20] No obstante, no entró a considerar la legislación que exige se destinen algunas áreas de los proyectos residenciales para facilidades vecinales, ni toda la reglamentación desarrollada por la Junta de Planificación consistente con la misma. Tampoco entró a sopesar toda la política pública, tanto estatal como municipal, erigida en torno al uso racional y ordenado de

---

[19]    Valga señalar que algunos de los fundamentos utilizados por la OMPU para sustentar su determinación inicial no fueron los más adecuados, puesto que basó su determinación esencialmente en los criterios aplicables a los Distritos R-3. No obstante, valiéndose del procedimiento del juicio *de novo*, la OMPU tuvo disponible una segunda oportunidad de presentar fundamentos válidos en derecho en los cuales basar su determinación.

[20]    Para llegar a su determinación, la JACL utilizó el Reglamento de Lotificación y Urbanización (Reglamento Núm. 6992) promulgado por el Departamento de Estado el 24 de junio de 2005.

los terrenos, ni tampoco realizó determinaciones conducentes a demostrar de qué modo el proyecto cumplía con los criterios del Distrito C-6.[21]

Del mismo modo, el Tribunal de Apelaciones confirmó el dictamen de la JACL, basándose primordialmente en la doctrina que aboga por la deferencia a las determinaciones de las agencias administrativas. Sin embargo, entendemos que la decisión de la JACL, a la cual el foro apelativo intermedio le ha brindado la mayor deferencia, no fue una razonable, pues no refleja un análisis abarcador y exhaustivo de toda la reglamentación y política pública que faculta a las agencias del Gobierno Central, así como a los Municipios Autónomos, a evaluar de forma integral y detenida cada solicitud atinente al desarrollo de sus suelos.

Básicamente el análisis rendido por el tribunal apelativo intermedio y la JACL se limitó a una aplicación mecánica de las guías contenidas en la Sección 1.12 del Reglamento de Lotificación y Urbanización. No reflejó análisis alguno sobre el efecto que tendría la concesión del permiso en la seguridad, salud e interés de la comunidad, factores medulares que, según la legislación y la reglamentación han de tomarse en cuenta al conceder o denegar permisos como el presente.

---

[21] A estos efectos, mediante un análisis somero constatamos que la estructura proyectada de dieciséis mil ochocientos pies cuadrados (16,800 p2), sobrepasa los límites de área de ocupación y área bruta de piso fijados para desarrollos en predios calificados como Distrito C-6.

En el caso de autos, se trata de un solar que fue separado para usos accesorios conforme con lo dispuesto por la Ley 25 y para cumplir con unos propósitos en particular. El Municipio, tomando en consideración las dimensiones y naturaleza del proyecto, los desarrollos en las áreas adyacentes, las vías de tránsito existentes y el impacto del proyecto sobre las mismas, determinó que éste rebasaba los parámetros estatutarios y reglamentarios aplicables al predio en cuestión. Al así hacerlo ejerció su función de adjudicación discrecional y descargó su responsabilidad de acuerdo a las facultades que ostentaba por virtud de los convenios de transferencia.

En particular, el Municipio determinó que el uso solicitado era contrario a la política pública establecida en el Plan de Usos de Terreno de la Región Metropolitana de San Juan, de la cual Carolina es parte. Específicamente, precisó que el proyecto propuesto no estaba acorde con la meta de promover la diversificación de actividades y de usos compatibles y complementarios y que, por el contrario, el mismo creaba un impacto adverso en los usos existentes.

Asimismo, el Municipio expresó que su denegatoria tenía como propósito evitar que continuara el crecimiento indiscriminado de comercios en las calles principales que dan acceso a los vecindarios residenciales y que afectan la calidad de vida de los residentes.

Algunos de los factores tomados en consideración por el Municipio al emitir su determinación fueron que: (1) el tamaño y la magnitud de la tienda propuesta son mayores al de los comercios de venta al detal que se encuentran en el área; (2) la localización del proyecto estaría a menos de cincuenta (50) metros de una intersección con gran volumen de tránsito, por lo que la entrada y salida de vehículos al establecimiento ocasionaría un mayor problema de flujo vehicular en las vías existentes; (3) a una corta distancia se encuentra una Farmacia Walgreens con venta de artículos al detal; (4) en los alrededores de la tienda propuesta se encuentran otros comercios con venta de artículos al detal, por lo que el área se encuentra bien servida en cuanto a ese tipo de establecimiento; (5) el proyecto no estaría acorde con el concepto de facilidad vecinal, según el mismo fue concebido originalmente; (6) el desarrollo envuelve una agrupación de solares para la ubicación de una tienda de gran tamaño, que no está dirigida a llenar las necesidades del vecindario, pues éstos están servidos, en demasía, con múltiples establecimientos que ofrecen artículos similares a los que se propone vender.

La posición del Municipio es que tanto en consideración a la Ley 25 y a la reglamentación sobre facilidades vecinales, como a las distintas políticas públicas de ordenación territorial, la evaluación de la referida Consulta conllevaba un cuidadoso ejercicio de

discreción y la ponderación de varios factores que ayudaran a determinar la conformidad del proyecto.[22] En ese sentido, su determinación constituyó, sin lugar a dudas, un ejercicio necesario, legítimo y razonable de discreción.

Los recurridos no pueden, además, justificar la autorización de su Consulta sobre Conformidad utilizando el argumento de que en esa área de "usos accesorios" se ha permitido la instalación de otros establecimientos comerciales. El permiso concedido a otros no les brinda un derecho a ellos, ni mucho menos despoja a la OMPU de su facultad de realizar las evaluaciones y análisis pertinentes para determinar si procede aprobar la Consulta sobre Conformidad en cuestión. De hecho, es importante hacer notar que el tamaño de los otros negocios, a los que Sembler hace referencia, no compara con el propuesto.[23]

En conclusión, en virtud de las disposiciones estatutarias y reglamentarias aplicables al caso ante nos, reconocemos la facultad de la Oficina de Permisos Urbanísticos para ejercer su discreción y tomar en cuenta,

---

[22] El Artículo 7 de la Ley 25 establece que las facilidades vecinales deben ajustarse a las necesidades de los residentes que han de servir. Sin duda alguna, los entes estatales y municipales encargados de otorgar autorizaciones y permisos de índole territorial tendrán que llevar a cabo una evaluación cuidadosa para determinar lo que es necesario para cada comunidad. Es decir, más allá de los requisitos objetivos, como son por ejemplo, los atinentes a altura, patios y rotulación, las disposiciones estatutarias y reglamentarias aplicables a los predios destinados para servicios vecinales, exigen una evaluación subjetiva de múltiples factores con el fin de determinar cuán adecuado es el proyecto propuesto para satisfacer las necesidades de dicha comunidad.

[23] En específico, el área de ocupación y área bruta de piso del Sizzler es de 581.13 $m^2$ y el de Wendy's es de 342.07 $m^2$, mientras que las del proyecto propuesto es de 1580 $m^2$.

tanto la política pública promulgada por el Municipio para el desarrollo de sus terrenos, como todos y cada uno de los factores establecidos en las leyes y reglamentos relativos a la ordenación territorial, al evaluar las solicitudes de permisos presentadas ante su consideración. Todo lo anterior con el fin último de lograr un desarrollo coordinado, racional y balanceado dentro de los límites territoriales de su municipio y de forma que se logre alcanzar con ello el bienestar general de sus habitantes. "La misión de un municipio autónomo, que adviene a las facultades y competencias de organizar el uso de sus suelos, es **planificar de forma coordinada y coherente la maximización de éstos**, conforme a las necesidades que impone su propia realidad social, económica y espacial." Unlimited Storage Corporation v. Municipio Autónomo de Guaynabo Oficina de Permisos Urbanísticos, *supra* (énfasis nuestro).

Además, la propia Ley de Municipios Autónomos dispone en su Artículo 1.004, 21 L.P.R.A. sec. 4002 (2005), que

> **[l]os poderes y facultades conferidos a los municipios por este subtítulo** o cualquier otra ley, excepto disposición en contrario, **se interpretarán liberalmente**, en armonía con la buena práctica de política pública fiscal y administrativa, de forma tal que siempre se propicie el desarrollo e implantación de la política pública enunciada en este subtítulo de **garantizar a los municipios las facultades necesarias en el orden jurídico, fiscal y administrativo para atender eficazmente las necesidades y el bienestar de sus habitantes.**

(Énfasis nuestro).    Véase, además, <u>E.L.A. v. Crespo Torres</u>, *supra*, págs. 787-788.

Es a tenor con la norma de hermenéutica de interpretación liberal esbozada anteriormente, que interpretamos las disposiciones aplicables a la controversia de autos, reconociéndole discreción a la OMPU para tomar en cuenta todos los factores de ordenación territorial pertinentes, al emitir una decisión que tendrá un impacto sobre el uso de los terrenos en su Municipio. Todo ello en aras de lograr un desarrollo seguro y saludable, que propicie el mayor bienestar de sus habitantes.

Por consiguiente, erró el Tribunal de Apelaciones al confirmar la Resolución recurrida mediante la cual la JACL revocó la denegatoria de la OMPU y autorizó una Consulta sobre Conformidad que no está acorde con la normativa estatutaria y reglamentaria, y las políticas públicas sobre ordenamiento territorial desarrolladas por el Municipio y aplicables al predio en cuestión.

## IV

Por los fundamentos anteriormente esbozados, revocamos la Sentencia dictada por el Tribunal de Apelaciones.

Se dictará Sentencia de conformidad.

ROBERTO FELIBERTI CINTRÓN
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| ARQ. DANIEL FRÍAS – THE SEMBLER COMPANY OF PUERTO RICO<br><br>Recurridos<br><br>v.<br><br>GOBIERNO MUNICIPAL AUTÓNOMO DE CAROLINA; OFICINA MUNICIPAL DE PERMISOS URBANÍSTICOS<br><br>Peticionarios | **Núm.:** <u>CC-2007-0232</u> | *Certiorari* |

**SENTENCIA**

En San Juan, Puerto Rico, a 6 de junio de 2012.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente Sentencia, revocamos la Sentencia dictada por el Tribunal de Apelaciones.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Hernández Denton y el Juez Asociado señor Martínez Torres inhibidos. La Juez Asociada señora Rodríguez Rodríguez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo